Jan'y Term,        Robinson *et al. vs.* Pitzer, use, &c.        1869.

# Wheeling.

ROBERT K. ROBINSON *et al. vs.* JOHN W. PITZER, USE, &C.

January Term, 1869.

1. A witness was interrogated as to whether he had a conversation with a certain party, in the spring or summer of a certain year, at a certain place in reference to the execution of a certain deed from himself to another party, and replied that he did not remember any such conversation. It was held that there was no sufficient ground laid for the admission of the statements of the witness to contradict him and impeach his credit.

2. The statements of a vendor made after a sale and conveyance of realty and personalty, and during the continuance in possession of the vendor as agent and manager of the vendee, are not evidence in chief either to disprove the purchaser's title or to establish fraud in the sale, when the other evidence in the cause failed to involve the transaction between the parties in such doubt or uncertainty or raise a reasonable apprehension of collusion, as would warrant a resort to the statements of the vendor after he had parted with the property, though holding a possession inconsistent with the change of ownership.

3. There is no error in permitting the record of a deed to go in evidence, where the original is in possession of the party offering such record, without accounting for the original.

4. A deed bearing the following endorsement is properly admitted to record: "Recorder's Office, Martinsburg, West Virginia, February 17th, 1869. This deed of bargain and sale from Enoch G. Hedges to John W. Hedges was acknowledged in the Recorder's office by the party grantor, and admitted to record. Teste, S. Garrard, R. B. Co. per J. R. Hite, Dept. R. B. Co."

5. It is not error to admit evidence of the intention of the parties to a deed that the purchaser should have the growing crop, that evidence being in harmony with the deed.

6. Though it is irregular, after the plaintiff has closed his evidence, and after the defendant has begun the delivery of his, to offer a deed in evidence, where the existence of such deed has been proven, without having reserved the privilege of doing so, yet the propriety of doing so is a matter depending upon the circumstances of the case at the time, to be judged of by the court; and there was nothing in the record of this case to show that the action of the court was not justified by the circumstances transpiring during the trial.

7. Though it is not necessary to stop the progress of a trial to prepare a bill of exceptions, yet at least the point made should be saved before the jury retires, and the bill may be then prepared and signed afterwards; but when exception is taken and the progress of the trial stopped for the purpose, and the bill is then prepared and signed, the parties may well rely on the case thus made by the record and shape their course accordingly. In such case it would not be error in the court after the verdict had been rendered, to refuse to amend the bill of exceptions, notwithstanding in general where the exception has been taken before the jury retired but the bill not drawn up and signed till after the verdict, the court may correct the bill to conform to the truth.

8. A party to a suit may be admitted as a witness when there has been a verdict, but no judgment, before the passage of the act of February 7, 1868, permitting parties to testify on their own behalf, in a trial had subsequently thereto.

John W. Hedges brought suit in the name of the sheriff of Berkeley county, on an indemnifying bond, against Robert K. Robinson and W. H. Mong, his surety, to October rules, 1866. The bond was given in pursuance of the levy of an execution in favor of Robinson against Enoch G. Hedges, on property claimed by John W. Hedges. The defendant pleaded conditions performed.

At the November term, 1867, a trial was had and a verdict rendered for the defendant. The plaintiff moved the court to set the verdict aside and grant a new trial, which motion was granted.

During this trial the plaintiff took one bill of exceptions and the defendant three.

The plaintiff's exception was for the following cause:

Enoch G. Hedges had been introduced to prove that the property levied on was the property of the plaintiff, and upon cross examination was asked if he "had a conversation in the spring or summer of 1866 with James W. Robinson, in the recorder's office, in reference to the execution of the deed from yourself to the plaintiff," to which the witness replied that he did not remember having any such conversation with James W. Robinson at the time and place stated. The defendant alleging that this was the foundation for the introduction of impeaching testimony, introduced the testimony of James W. Robinson, as follows: that

late in the spring or summer of 1866, I had a conversation with Enoch G. Hedges, in the ante-room of the recorder's office of Berkeley county, about the sale and conveyance of his property to his brother, John W. Hedges, which then had been made. That upon that occasion, he commenced the conversation by requesting me to take an assignment of an open account, which he held against Peter Dick, and collect it for him. I told him that there was no necessity for that, as the law in relation to the suitor's oath had been so modified, that it did not apply to any case, where the cause of action was since the first of April, A. D. 1865; that his account against Dick was of that character and that he could collect it in his own name. He said that there were other reasons, that he was in debt, and that it might be attached; he then said he would assign it to Mrs. Israel Robinson, who was the widow of a deceased relative."

"That the said Enoch G. Hedges then said he had put all his property, real and personal, out of his hands; that parties were obtaining judgments against him for property he had taken while he was in the rebel army; I told him that I had not heard that he had taken that course; that I thought it was hardly worth while to do it; that perhaps the judgment might not stand. He was not willing to risk it, and that he had assigned all his property to his brother John. He said his wife objected to it at first, saying, she did not think it was an honorable way of dodging responsibilities. He said he told her that if they did not do it, their property would all be consumed by the judgments that would be taken against him, and that he did not intend to put himself in a position where he would be compelled in their old age to labor for their bread and meat; he said a part of their means had come through her, and he did not mean that it should be wasted for anything he had done; that the transfer he had made to his brother John, would leave the property to his (Enoch's) hands and under his control and that he could have the use of it.

"That the claims against him, for which it was likely to be taken, were unjust, and that it would not be right to have

his property taken to pay them. That the transfer he had made of his property would not rob any honest creditor to whom he owed honest debts. That he did not owe much else and would soon pay his honest debts, and, amongst others, named the claim of defendant, Robert K. Robinson, as one he would pay.

"That his wife, upon his representing his circumstances and condition, assented to the assignment. I asked him if his brother John would stand by him, and whether, after all, his property might not be taken to pay these judgments. He said he thought John would stand by him. He spoke of the suit and judgment in favor of defendant, R. K. Robinson, against him, and said it was uncalled for and unnecessary, that he would have paid it without suit, but he would want some time on it. That his farm would have to be stocked; that he had lost by the war; that his farm had been stripped, and that he would have to stock it before he could pay the defendant's judgment; that he thought the defendant had treated him harshly; that he did not need the money and ought not to sell the little stock he had. If he persisted in selling it, he would have to get John after him.

"He asked me what I thought about it; I told him the debt was an honest one and he had better let it alone. I told him there was danger in it, that it might open up the whole question of his assignment to John, and that John might not be able to maintain his title. He said he thought John would stand by him in anything he might do, and that there would be no danger as to the title. Mr. E. G. Hedges is about sixty years old; until the war commenced, the family of E. G. Hedges and myself had always been on very intimate and friendly terms; I am the nephew of Robert K. Robinson."

The plaintiff objected to the admissibility of this evidence for the purpose of impeaching the witness Hedges, but being overruled by the court, he excepted.

The defendant's first bill of exceptions was as follows:

"Be it remembered, that upon the rendition of the verdict in this cause, the defendant, by his counsel, moved the court

to amend the bill of exceptions, filed by the plaintiff, during the progress of the trial, by the insertion of the following facts, which were stated by E. G. Hedges, the witness referred to in said bill of exceptions, which statements were made before the testimony of James W. Robinson was allowed to go to the jury, as stated in said exceptions, to wit:

The said E. G. Hedges testified that the consideration of the deed filed with said exceptions of the plaintiff, was the sum of 8,000 dollars, in which sum in part, he stated, he was indebted to John W. Hedges, at whose relation or for whose benefit this suit was brought, the said John W. Hedges, being the grantee in said deed, and the residue of said sum of 8,000 dollars, he stated, the said John W. Hedges expected to pay in discharge of debts due by said E. G. Hedges, and that the ruling of the court, stated in said exceptions was, in part, founded upon the previous testimony of E. G. Hedges, as herein stated. But the court refused to amend said bill of exceptions, on the grounds that it was too late to do so, after the same had been signed and sealed, and a verdict rendered by the jury in the case, and the jury discharged."

The defendant's second bill of exceptions was as follows:

"Be it remembered, that on the hearing of this motion, the court sustained said motion, set aside the verdict and granted a new trial prayed by the plaintiff. Because, that in the progress of the trial the plaintiff introduced as a witness, E. G. Hedges, who, it is claimed, had sold and granted to John W. Hedges certain realty and personalty in question, and after having been questioned and answered at length as to the transaction in question, and among other things, answered that he did not remember to have had a conversation with James W. Robinson at a certain time and place named, upon the same subject, or to have made to him a different statement; said James W. Robinson was allowed to be introduced to prove that the witness, E. G. Hedges, had made a different statement to him on the same subject. To the introduction of which testimony the plaintiff objected and excepted, and a bill of exceptions was prepared at

the bar, and under the impression that it was prepared to the satisfaction of the attorneys on both sides, it was signed and sealed by the court without examination, making the court to have ruled that a sufficient ground had been laid to warrant the introduction of the evidence of James W. Robinson to impeach the witness, E. G. Hedges, &c., the court having in fact only ruled or intended to rule, that it was competent to introduce the evidence of said Robinson to rebut and contradict the testimony of said E. G. Hedges, and the court not having observed the character of said bill of exceptions until after verdict and jury dismissed, and not able to know but that the jury had acted on the case on the idea as contained in the bill of exceptions, the court sustained the motion and granted the new trial, to which the defendants excepted."

The defendant's third bill of exceptions was as follows : ·

" Be it remembered, that after the rendition of the verdict in this cause, the plaintiff, by his attorneys, moved the court to set aside the verdict, and grant him a new trial upon the ground alone of an alleged and supposed error by the court, in the ruling as shown in plaintiff's bill of exceptions No. 1, and the admission of the testimony of James W. Robinson, as therein stated. Plaintiff's attorneys announcing that the motion was made in defference to the instruction of the court on the consideration of defendant's motion to amend plaintiff's bill of exceptions No. 1 as indicated by defendant's bill of exceptions No. 2, and to avoid the delay of appeal, but the motion would not be pressed if resisted. Defendants resisted the motion, but the court for the reasons stated in defendant's bill of exceptions No. 2, granted the new trial, as therein stated, and to the motion of defendants, with their said bill of exceptions, that the court certifying the facts proven on the trial, the plaintiff objected for the following reasons, to wit : .

1st. That no motion had been addressed to the court, to set aside the verdict, because it was against, or not warranted by the evidence.

2d. Because, after the admission of the evidence of James

W. Robinson, in the manner, and for the purposes set forth in plaintiff's bill of exceptions No. 1, the further prosecution of the case by the plaintiff was abandoned and the case submitted to the jury, without argument, the plaintiff relying upon the point reserved in his said bill of exceptions, as against any verdict that might be rendered in the case.

3d. Because the application for a new trial being based exclusively upon the alleged error in the admission of the testimony of James W. Robinson, it is unnecessary to certify the fact, the verdict being presumed to be well founded, unless there was error in the admission of that testimony. But the court being of opinion that the testimony of James W. Robinson was properly admitted but not for the purpose or the reasons stated in plaintiff's bill of exceptions No. 1, and the refusal of the court to amend said bill of exceptions having been excepted to by defendants, the court overruled the said objections of plaintiff's counsel, and now here certifies the facts proven on the trial of the cause."

The testimony of Enoch G. Hedges was certified as follows:

"That at the time of the sale of the farm, in February, 1866, it was agreed that John W. Hedges should take the wheat crop, then in the ground, with the farm; that the wheat levied on and sold was of the same crop.

"It was further agreed at said sale that the said Enoch should remain upon the farm as the agent of the said John W. Hedges, farm, deal, cultivate it, and that his family should be supported from the farm, and that so much of the products and profits of the farm to the support of the said Enoch's family as was necessary he should pay John an amount not exceeding six per cent. upon the amount the said John had invested in the farm, and the surplus the said Enoch should have and appropriate to his own use; that he has ever since occupied and cultivated the farm under that arrangement, and expects to continue to do so as long as John will permit him. That he has used, controlled and occupied the farm just as he did before the sale, except that he has since acted as John's agent; that he had been a

quartermaster in the rebel army in 1861, and as such had impressed a large amount of property from persons residing in Berkeley and Morgan counties for the use of the rebel armies, and that in the year 1865 sundry actions of trespass had been brought against him in the circuit court of Berkeley, to recover damages for the property so taken. That in December, 1865, thereof, said causes were tried and judgment, recovered against him, amounting in the aggregate to about 2,000 dollars. That he knew if such actions could be sustained and suit should be brought against him, that his liabilities would exceed the value of his property and that he could not carry on his business of farming. That he was "gone up." Told his brother, John W. Hedges, so. That he, John W. Hedges, furnished the money to buy the horses levied on by the sheriff, for which levy this action is brought. That he, Enoch G. Hedges, bought the horses for John W. Hedges, who sent him the money to pay for them. That he bought one of them from Mr. Morgan and the other up the valley; paid 83 dollars for the one bought up the valley; had refused 175 dollars for one of them and 125 dollars for the other, which was a mare with colt; there was 400 bushels of wheat levied on, a little of it was in a damp condition; it was worth 2 dollars and 50 cents per bushel; lost 20 cents per bushel in the sale on account of its damp condition. The witness says the wheat belonged to John W. Hedges, also 406 bushels of oats levied on, and 100 bushels sold; it was so spoiled, subsequent to the levy, that the horses would not eat it; there came a rain on it a few days before it was thrashed; it sold at 25 cents per bushel and was not worth that; it might have been saved if it had not been put in a tight place and locked up; there was 300 bushels of wheat sold; what was left was damaged, 3 bushels was worth about two bushels of sound wheat; sold the land for 8,000 dollars, subject to his wife's dower; was in debt to his brother, John W. Hedges; owed him a considerable amount, about 6,326 dollars and 20 cents, evidenced by previous bond and trust deeds; he assumed 900 dollars to minor heirs of Thatcher; about 1,000 dollars to

Mrs. Fulk; 75 dollars or 80 dollars to Tabler, and payment of the judgments in the trespass cases, upward of 2,000 dollars; I sold some personal property to my brother, John W. Hedges, and he was to indemnify my securities in the trespass cases; do not recollect having a conversation with James W. Robinson in the ante-room of the recorder's office in June or July, 1866, about the execution of the deed to my brother, John W. Hedges."

The residue of the testimony was corroborative of the testimony of witness Hedges as to the condition of the grain levied on; George Wyncoop proved that he furnished witness 200 dollars to buy horses with, for which he gave him an order on the plaintiff, who subsequently paid it; Daniel Lafever proved that he was called on to value the personal property of E. G. Hedges in February, 1866, and that it was sold to plaintiff at his appraisement, and that the horses sued for were not in the appraisement; it was then said to be a *bona fide* sale.

The second trial was had in March, 1868, when the jury found for the plaintiff and assessed damages to the extent of 890 dollars. The defendant moved for a new trial, First, because the verdict was not warranted by evidence; Second, because the verdict was contrary to law; Third, because the verdict was contrary to the charge of the count. The court overruled the motion and gave judgment, and defendants excepted. During this trial the defendant took four bills of exceptions. The first was taken because the court permitted the plaintiff to offer in evidence the original record of the deed from E. G. Hedges to John W. Hedges, dated in February, 1866, together with the testimony of the recorder, that the certificates of acknowledgement and recordation were genuine, without the original deed being produced or its loss accounted for, or producing other evidence of its existence or execution.

The second bill was taken because the court permitted the witness Lafever, who had appraised the personal property and made a memorandum thereof, to testify as to the agreement at the time of sale of the land that the wheat

crop in the ground should pass to the plaintiff with the land, no memorandum in writing as to the wheat having been made, and also because the court permitted John W. Hedges, the plaintiff, to testify in his own behalf.

The third bill was taken because the court permitted, after the plaintiff had rested his case and the defendant had examined two witnesses and was waiting for another to be put on the stand, the plaintiff to offer in evidence the original deed from E. G. Hedges to the plaintiff, the record of which had been previously offered; and also because no evidence had been offered to prove the execution of the deed or that it was in the handwriting of the grantor, except that Seaman Garard, the recorder of Berkeley county, had testified that the acknowledgment on the back of the deed, with his signature thereto, was in his handwriting, and was as follows: "Recorder's office, Martinsburg, West Va., February 17th, 1865. This deed of bargain and sale from Enoch G. Hedges to John W. Hedges was acknowledged in the recorder's office by the party grantor, and admitted to record. Teste: S. Garard, R. B. Co., per J. R. Hite, Dept. R. B. Co."

The fourth bill of exception was taken to the refusal of the court to set aside the verdict and grant a new trial and contained the evidence in the cause, which is substantially the same as that given on the former trial. John W. Hedges, the plaintiff, proved that the horses sold, taken under the execution, were his at the time of the levy, he having paid for them; that he bought the wheat crop growing in the ground at the time of the sale of the land.

E. G. Hedges testified as follows: "that he was the owner of the farm upon which he then lived, until he sold it to his brother, John W. Hedges, in February, 1866; he has been on the farm as agent since, but has no contract as to time, and does not know how long he will be permitted to stay there; his brother pays the taxes, and everything on the farm belongs to him; witness gets his support from the farm and all that exceeds six per cent. upon the cost of the farm witness is to get for his care and attention to it; he

sends his wheat to him in Baltimore by the railroad; witness never owned the two horses sold by Deputy Sheriff French—they were bought for John W. Hedges and paid for by him; by the sale to his brother the amount of wheat then on the land passed to him—this was by express agreement. The oats sold, was sown after the purchase of the land by John W. Hedges, and was his oats.

"Witness has no recollection of a conversation with James W. Robinson, in July, 1866, in reference to the execution of said deed to his brother, but had a conversation with him about the suits brought against him; during the late war witness was in the rebel service, mostly in the valley and in Berkeley county; was detailed as a soldier to seize property, and took some property in Berkeley and Morgan counties; cannot tell the amount; if witness was worth 100,000 dollars he could not have paid for all that he impressed; does not know that any person ever threatened to sue him except those who did actually sue him and obtained judgments.

"On cross-examination said, the sale to John W. Hedges was fair a *bona fide,* honest transaction; the price for the farm was 8,000 dollars, subject to the contingent title to dower in Mrs. Hedges; the purchase money was fully paid by the purchaser; the horses sold by the sheriff, were not embraced in his sale of personal property to his brother; they were his brother's, bought for him and paid for by him; witness never owned them; witness was to have a living on the farm and pay John W. Hedges six per cent.; John W. Hedges sent bags from Baltimore and I sent the grain to him there."

James W. Robinson's testimony is certified as follows:

"James W. Robinson, in June or July, 1866, had a conversation with E. G. Hedges in the ante-room of the recorder's office:—here an objection was taken to the admissibility of the evidence of the witness.

"1st. That no declaration or admission of E. G. Hedges, made after the date of his sale, could be received against his vendor.

"2d. That the defendant could not contradict or impeach his own witness: but the court permitted the witness to prodeed: he, E. G. Hedges, wanted to assign a claim against Peter Dick to me and gave as a reason, that it might be attached by his creditors; I declined to become the assignee and he then assigned it to Mrs. Israel Robinson, his sister-in-law; he said he had deeded his property to his brother John, that his wife had objected to what he had done and did not think it was honorable thus to avoid responsibility, but he had told her that he had to do that or his property would all be taken to pay debts that he did not justly owe, and they would then have to labor in their old age in poverty; that they could get the property again when they wanted it, and in the meantime have the use of it; he spoke of the debt of the defendant, R. K. Robinson, said it was a just one and would be paid if a little time was given him; he said his brother, John, would stand by him, and he had a notion get John to — after R. K. Robinson, to sue him to recover back the value of the property which he made the sheriff sell to pay his debt; I told him that it was a dangerous proceeding to put his property out of his hands, and that it might have the effect of having it all taken to pay his debts; he said he had got a part of his property by his wife and it was duty to take care of her; he thought the farm might be worth 50 or 55 dollars per acre, with the dower right of Mrs. Hedges still in it."

John W. Hedges', the plaintiff's, testimony is further cerfied as follows:

"John W. Hedges, on behalf of the plaintiff, proved that he purchased the farm from his brother, E. G. Hedges, at the price of 8,000 dollars, subject to the contingent title of dower in Mrs. Hedges; he paid for it as follows: 1st, by a bond of E. G. Hedges, for 3,100 dollars, dated January 1st, 1858, secured by a trust deed, not placed on record, and bearing interest from that date; bond and deed of trust produced in court; another note of E. G. Hedges, for 650 dollars; interest from the 10th day of April, 1851; bond also produced; by amount paid Mrs. Fulk for Enoch G.

Hedges, 1,018 dollars; amount paid Thatcher's heirs, 900 dollars; amount paid Tabler for him, 80 dollars; cash sent 22 dollars and 50 cents, which, with the judgments against his brother, amounted, on the day of sale, to 10,116 dollars and 80 cents, much more than the agreed price of the land; the sale was in all respects fair and honest; he bought the farm because he had always desired it, as the place of his birth and the home of his parents, because his brother could not hold it, and because, being largely indebted to witness for previous advances, the purchase could be made by him without inconvenience; all the debts enumerated as forming payments of the land were just and *bona fide* demands; he permits E. G. Hedges to remain upon the farm and make an honest support for himself and wife from it; he is there by virtue of no contract, agreement or consideration, but solely as an act of fraternal kindness and fraternal duty, liable to be removed at his pleasure; whilst there E. G. Hedges is to get a living from the farm, and after paying me six per cent. on the purchase money, is authorized to retain the residue for his care and attention to the farm; is a Methodist preacher and has resided many years in Baltimore, and still lives there; married a lady of fortune and applied her money to the purchase of said land.

And the court certified the above to be all the facts proven in the cause, and having, upon the state of facts, refused to grant the defendants a new trial, the defendant excepted and prayed that his exceptions might be signed, sealed and enrolled, which was accordingly done.

The defendant obtained a writ of supersedeas from this court.

*Stanton & Allison* for plaintiffs in error.

It will be seen from the record that the action in the circuit court was a suit on an indemnifying bond given by the plaintiffs in error to the sheriff of Berkeley county to indemnify against any loss or damage by reason of the sale of certain property, levied as the property of Enoch G. Hedges on a judgment against him in favor of R. K. Robinson. The

real question in controversy was upon the *bona fides* of the sale of a farm and the personal property levied on, and alleged to have been made by the judgment debtor, Enoch G. Hedges, to his brother, John W. Hedges.

The first error assigned is that the court erred in setting aside the first verdict rendered in the cause. This involves sundry questions made upon the first trial of the cause the decision of which are also assigned for error. It is not claimed that the first verdict was not warranted by the evidence. The only ground upon which it was asked that it should be set aside was that the court permitted improper evidence. The ground upon which it was granted was that the court had improvidently signed an untrue bill of exceptions, and that there was no other mode of correcting it.

This was clearly error. The court decided in the case of *Seabright* vs. *The State*, 2 West Va. Rep., that the court had power to correct an erroneous bill of exceptions at any time during the term at which it was taken. From the bill of exceptions it appears that the court refused to correct the bill of exceptions, which was admitted to be erroneous. This was clearly erroneous. As to the alleged error of the court in setting aside the verdict the case rests mainly upon the competency of the evidence of James W. Robinson. It is claimed by the plaintiffs in error that this evidence was competent on two grounds. 1. As an independent evidence to prove the intent with which Enoch G. Hedges made the sale. 2. To impeach the evidence of Enoch G. Hedges that the sale was made by him in good faith; and first it must be borne in mind that the question is not whether the acts or declarations of Enoch G. Hedges were sufficient *per se* to establish fraud and set aside the sale. To establish fraud it is necessary to show that the grantor conveyed with intent to defraud his creditors, and that the grantee took the conveyance for the same purpose. If a failing debtor sell for the honest purpose of raising money to pay his debts the sale is good, though the purchaser may have purchased for the purpose of preventing the property from being taken in execution for the payment of the

sellers' debts. So if the seller conveys his property for the purpose of defrauding his creditors, but the purchaser buys for the purpose of speculation and profit, the sale is good. So that to set aside a sale because it was. made to defraud creditors the buyer and seller must both have concurred in the fraudulent intent. The intent. of the seller and the intent of the purchaser are separate and distinct facts which must be proved by proper and competent evidence. To prove the intent of the buyer his acts and declarations are competent, and to prove the intent of the seller his acts and declarations are competent, *no matter who may be the parties to the suit.* That the acts of a fraudulent grantor are competent is established by every day practice. That he remained in possession of the property after the sale, and exercised acts of ownership over it, offered to sell it or rent it, paid taxes on it, &c., are the usual and ordinary badges of fraud relied upon everywhere as *prima facie* evidence of fraud; and there is no difference in principle between the acts and declarations of a party. The fact that the party whose declarations are offered is not a party to the suit does not make his acts or declarations incompetent.

In the case of *Davis* vs. *Pierce*, 2 Term Rep., 53, the declarations of a tenant in possession as to the party under which he held were held competent.

In the case of *Aunson* vs. *Kinaird*, 6 East, 188, the declarations of a wife as to the state of her health at the time when an insurance was taken upon her life were held competent in an action on the policy.

In the case of *Clymer* vs. *Littler*, 3 Burrows, 1255, it was held that the declarations of a deceased witness to a will that he had forged, were competent in an action of ejectment against the devisee claiming under the will.

In the case of *Bridge* vs. *Eggleston*, 14 Mass. Rep., 250, it was held that the declarations of a fraudulent grantor made before the conveyance are admissable against the grantee. The court say "to prove fraud in the grantor his conduct and declarations before the conveyance may be the best and the only evidence within the power of the creditor." It is

true that the court in this case say that declarations made after the conveyance are not admissable. But this was mere *obiter dicta*, as no such question was before the court. But surely the fraudulent intent of the grantor may be proved as satisfactorily by acts and declarations made after as before the conveyance. And this is not controverted. But it is said that the grantee ought not be bound or prejudiced by the declarations of the conveyance. Certainly not. Nor should he be bound or prejudiced by his acts or declarations made before the conveyance, unless they can be brought to the knowledge of the grantee, and that was the very question in the case last referred to, and the court held that they were. It seems to us that the true rule is to allow the declarations and acts of the grantor should be competent to prove the fraudulent intent of the grantor, and for no other purpose, and the jury should be charged that they were not competent to prove fraud in the grantee. And if the declarations were competent for any purpose it was not error for them to be given to the jury.

In the case of *Nadenbousch & Riddle* vs. *Sharer & Martin*, 2 W. Va. Rep., it was held that it was not error to read in evidence to the jury the special pleas filed by the defendant; and held insufficient on demurrer as matter *in pais*, though the defendant was not bound by them. But that the defendant having a right by law to file several pleas to an action he was not concluded by an admission made in any of his pleas, but he might deny them on the trial and offer evidence to contradict the facts admitted by them. So in the case of *Sherard* vs. *Kuykendall*, 2 W. Va. Rep., where a plea of *non est factum* was verified by one of several joint makers of a bond, and the party by whom the affidavit was filed objected to its being offered in evidence without proof of its execution, which was overruled by the court, and the bond given in evidence. It was held by the court that this was no error, because the affidavit to the plea only put the plaintiff on proof of the execution of the bond by the party who verified the plea, but that it was competent evidence against the other parties without proof of its execution.

That if it was competent evidence against one of the parties or for any purpose there was no error in permitting it to go to the jury.

The case of *Williams* vs. *Bridges*, 2 Starkie, 38, was an action against the sheriff for an escape of a debtor arrested on a *capias ad respondendum.* The action against the debtor was on a bill of exchange, and to prove the debt evidence was offered of the admission of the debtor that he had received notice of the dishonor of the bill.

It was objected that the debtor was not a party to the suit and therefore his declarations were not competent. But it was held by the court that whatever was evidence against the party was evidence against the sheriff.

In the case of *Sloman* vs. *Hearve*, 2 Espinasse, 695, which was an action against the sheriff for an escape, it was held that the debtor's admission that he owed the debt for which the suit was brought, was competent evidence against the sheriff.

To prove a forfeiture by underletting, declarations of persons in possession were admitted in evidence against the lessee. *Doe, ex'or of Hinckley, vs. Richerly*, 5 Esp. 64.

An admission by a prior occupier possessing an interest is evidence of the nature and extent of interest. *Walker* .vs. *Broadstock*, 1 Esp. C., 458.

On an indictment against "A" as an accessory to a felony committed by "B," the confession by "B" that he committed the felony is competent evidence. 3 Starkie on Ev., 1303–4.

The admission of a party in possession of land, whilst he is in possession, is competent evidence, though he is not a party to the suit. *West Cambridge* vs. *Lexington*, 2 Pickering, 536.

The declarations of a person in possession of land as to his title are admissable in evidence against him, and all persons claiming under him. *Jackson, ex'or* vs. *Bond*, 4 Johnson, 230.

"Declarations of the vendor after the sale, as to the fraud when creditors are concerned, may be received if he con-

tinues in possession. 3 Cowan & Hills notes to Phillips on Evidence, 283; *Thompson* vs. *Thompson*, 9 Ind., 327; *Doe* vs. *Evans*, 8 Blackford, 322; Cowan & Hills notes to Phillips, pt. 1, page 654, note 481.

It is for the court to determine when such a combination and conspiracy has been established as to authorize the declarations of the conspirators to be given in evidence. *Clayton* vs. *Anthony*, 6 Rand., 298, Green, Judge; 2 Phillips' Evidence, note 481 to page 257; notes, p. 662; note 452 to p. 234; notes, p. 602; *Wilbur* vs. *Stricland*, 1 Ramer, 458; *Willis* vs. *Farley*, 3 Car. & Payne, 395; *Bable* vs. *Clauson*, 10 Sarg. & R., 419 & 12; S. & R., 328; *Doe* vs. *Askwright*, 5 C. & P., 575; *West* vs. *Price's Heirs*, 2 J. J. Marshall, 380; *Church* vs. *Burkhart*, 8 Pick., 327; Cowan & Hills notes, part 1, p. 597, 598, 599.

The fourth error assigned makes the question as to whether the proper foundation had been laid for proving the declarations of E. G. Hedges to Robinson. If we are right in supposing that the declarations of E. G. Hedges are competent to show a fraudulent intent on his part in making the conveyance to John W. Hedges, or that the acts and declarations of E. G. Hedges, who was in possession of the premises in controversy, are competent without regard to what he testified on the trial, then this question is of no importance. But if the court should differ with us on both of these questions, then it becomes important to inquire whether the proper foundation was laid for proving declarations of the witness inconsistent with his testimony for the purpose of impeaching it. It is important for us to understand clearly and definitely the principles upon which a foundation is required to be laid before offering evidence of the previous statements of the witness. It rests solely upon the idea that the witness should have an opportunity of explaining the declaration imputed to him. Prior to the Queen's case the practice does not seem to have been settled and uniform.

Sometimes the attention of the witness was called to the supposed declaration, and an admission, denial or explana-

tion of it asked before the evidence of the declaration was introduced. Sometimes the evidence of the former declaration was offered first and the witness recalled on rebutting, and explanation asked. Either mode was regarded as regular and proper, as either gave the witness full opportunity to explain any supposed conflict. But it was purely a matter of practice to be regulated by the discretion of the court in which the cause was tried. It is so stated and so regarded in the opinion of the judges in that case; and certainly if the declaration were offered first and the witness were afterwards recalled, and his admission, denial or explanation given, no harm to either party could result from it, and no court would reverse the judgment for that reason. *Judson* vs. *Blanchard,* 5 Conn. Rep., 557.

This whole doctrine, so far as the reported cases show, rests upon the Queen's case, 2 B. & B., 314. That case was a very peculiar one. It was an impeachment or criminal prosecution before the House of Lords. When a question of evidence arose upon which there was any doubt, questions were propounded in writing by the Lords to the twelve judges, as to the practice in the court of common law in such cases. They do not seem to have been argued. The judges would withdraw and consult and the result of their deliberations would usually be announced by a written opinion read by the Chief Justice. There was no question of error in the decision of questions as to the manner in which evidence should be given by a subordinate court. They were simply *nisi prius* decisions, touching the manner of giving evidence in a cause on trial before them. And the judges announce what the courts have found to be a convenient and orderly mode of examining witnesses, but it is not assumed or pretended that if a court in its discretion should depart in an unimportant particular from the mode then adopted that it should be error.

In the case of *Lamb* vs. *Stewart,* 1 Ohio Rep., 377, it was held that it was competent to prove statements of a witness inconsistent with his testimony without laying any foundation by inquiring of the witness whether he had made

such statements.   The same doctrine was held in the case of *Sheldon and wife* vs. *Cunningham*, 1 Blackf., Ind. Rep., 86.

. In the case of *Perry* vs. *Massy*, 1 Baily's S. C. Rep., 32, it was held that a party might prove contradictory statements made by his own witness before the trial without asking him if he had made such statements.

. The same doctrine is also well settled in Maine.   *Ware* vs. *Ware*, 8 Greenl., 42; and in Mass. ; *Tucker* vs. *Welch*, 17 Mass. Rep., 160.

The question seems never to have arose in the court of appeals in Virginia.

The cases of *Charleton* vs. *Unis*, 4 Grat., 58, and *Ford's case*, 16 Grat., 547, turned upon the question whether the evidence of the witness which it was sought to contradict by evidence that the witness had made statements in conflict with his evidence, was relevant to the issue joined between the parties. This court is therefore at liberty to adopt such rule as will conform to sound legal principles, and be convenient and safe as a rule of practice.   We do not deny that since the decision of the Queen's case the weight of authority in England and in this country is, that before evidence can be given of statements of the witness in conflict with his evidence, his attention must be called to the matters proposed to be proved for the purpose of contradicting his evidence. But we do claim that all that is necessary to lay the foundation for such evidence is to call the attention of the witness to the time and place and person, when and where and with whom the conversation was had, and the subject of the conversation.   That it is not necessary to call upon the witness to admit or deny the precise statement which it is proposed to prove.   Such a rule will frequently be found impracticable. It will make it necessary in every case where such evidence is to be offered for counsel who try the cause, to see the witness in person and ascertain precisely what he will testify, and when and where the conversation was had.   This ought to be avoided if possible, because out-door conversation of counsel with witnesses are very apt to result in "drilling" the witnesses.   Counsel understand better than the wit-

nesses what evidence will benefit their clients, and the temptation is very strong to suggest to the witness that it might be well to omit such matters as would prejudice his case, and so modify his evidence as to make it as favorable as possible for his clients.　But a still more serious difficulty is that the witness may refuse to tell what he knows or what he will testify to until he is called to the stand to testify; and this in fact was the difficulty in the case at bar. The witness refused to inform the party or his counsel what the conversation was.　When the relation between the witnesses sought to be impeached and the witness by whom he is to be impeached are friendly there is ordinarily a great reluctance to testify to anything that may give offence. Hence if it can be avoided by refusing to tell the party or his counsel what he will testify to he will refuse and the party will be deprived of the benefit of his testimony. Hence there should always be a reasonable discretion allowed to the court in which the cause is tried, to determine what is a sufficient foundation for the impeaching testimony, which may depend upon the circumstances of the case.　If the statement sought to be contradicted should be in the deposition of an absent or deceased witness a more strict rule ought to be required, because the witness whose evidence is sought to be impeached cannot be recalled to explain the statement attributed to him, so if it should be ascertained upon inquiry that the witness whose evidence is sought to be impeached had left the court and could not be brought back for the purpose of explanation, it might justify a more rigid rule in regard to laying the foundation for the impeachment.　But if the witness is present in court and hears the evidence of the impeaching witness, and can be immediately recalled for the purpose of explanation, there is no possibility that the party or the witness can be prejudiced by the generality of the questions asked for the purpose of laying the foundation for the impeachment. Hence in such a case a more liberal rule ought to be adopted.　The whole object and purpose and spirit of the rule is to prevent surprise, and where the reason

of the law ceases the law itself ought to cease.

In the case of *Crowley* vs. *Page*, 7 C. & P., 789, Parke Baron deals with the question in a sensible and lawyerlike way. He says "to lay the foundation for the admission of such contradictory statements and to enable the witness to explain them, and, as I conceive, for *no other purpose*, the witness may be asked whether he ever said what is suggested to him with the name of the person to whom or in whose presence he is supposed to have said it, or *some other circumstance sufficient to designate the particular occasion.*" This was upon the trial of a cause at *nisi prius*, where a question arose as to the admissibility of the evidence. Here is no precise form of expression required, but the inquiries suggested, or such other circumstances as may be sufficient to designate the particular occasion and give the witness an opportunity to admit, deny or explain. And who is to judge of the sufficiency of the "circumstances?" Clearly the court before whom the cause is tried. Certainly if the court should abuse its discretionary powers and allow impeaching testimony without giving the witness a fair opportunity to explain, its judgment would be reversed. But every presumption will be made in favor of the judgment of the court in which the case is tried.

In the case at bar the question was: "had you a conversation in the spring or summer of 1866, in the recorder's office, in reference to the execution of the deed from yourself to the plaintiff?" To which the witness replied "that he did not remember having any such conversation at the time and place stated."

It will be seen from the evidence of Enoch G. Hedges that he says he "does not recollect having a conversation with James W. Robinson, in the ante-room of the recorder's office, in June or July, 1866, about the execution of the deed to his brother, John W. Hedges.".

It may fairly be presumed that the defendant was not informed what E. G. Hedges said in the conversation referred to, but had information that in that conversation he had said something which tended to show that the sale was

fraudulent. He, therefore, could not make his question more specific. The witness denied, so far as his recollection went, that he had had any such conversation as was suggested by the question. What more could the party do? Could he, or should he, have asked him what he said in a conversation which he had never had? Could he have asked him if he said so and so in a conversation which he could not recollect that he had ever had? Surely the party was not bound to torture the witness and cast implied imputations upon his integrity, by asking questions which implied that his former answer was not true. The party had done everything in his power to call the attention of the witness to the matters in which he proposed to contradict him and give him an opportunity to give his own version and explanation of it. If Robinson's testimony brought anything to his recollection that he did not remember before, it was still competent to recall him and get his explanation. It will not be presumed that he had left the court, *non constat*, but the fact that he was present when Robinson testified may have induced the court to admit the evidence, knowing that he could have an opportunity to explain.

In the case of *Daniels* vs. *Conrad,* 4 Leigh, 402, a witness was asked on cross-examination if he had not offered to sell the land to one Crouch for less than 400 dollars. He answered that he had not as well as he remembered, that if he had it was very little less. Here was no specification of time or place and yet it was held that a sufficient foundation had been laid to authorize the party to prove by Crouch what he had offered to sell him the land for. It is well settled that when a witness in answer to a question, whether he has said or done a particular thing, says he cannot remember whether he has or not, this is a sufficient foundation for proof that he has said or done the thing inquired about.

In *McKenney* vs. *Neil,* 1 McLean, 547, Judge McLean, on the trial of a cause, to the jury held that the correct rule of practice was to lay the foundation for impeaching evidence by propounding the proper questions to the witness

sought to be impeached, and in that very case he allowed the evidence to go to the jury, though no such foundation had been laid. The evidence contradicted in that case was a deposition, when, of course, the witness was not present to admit, deny or explain the statement attributed to him after the impeaching evidence had been given. This shows that he regarded the matter as a question of practice, which was under the control of the court in which the cause was tried. Ordinarily the matter sought to be contradicted consists of a simple statement of a matter of fact embraced in a single sentence, so that the most convenient way of calling the attention of the witness to the matter is to ask the witness whether he did or did not make the statement suggested to him. But it is manifest that when the statement sought to be proved consists of the whole of an extended conversation embracing numerous details, which, taken together, are inconsistent with the evidence of the witness, the only way to lay the foundation for proving contradictory statements is to ask the witness if he had a conversation with a person named at the time and place specified on the subject to which his evidence relates. If he says he had, he may then be asked what the conversation was. If he gives it, then it is competent to prove that his conversation and statements were not the same that he has stated in his evidence. The attention of the witness having been called to it and his version of it given then it is no surprise upon him in then calling upon the other party to the conversation, or any person who was present and heard it, and proving that his statements were directly in conflict with his evidence; and on the other hand, when he denies having had any conversation with the person on the subject, and at the time and place named, it is competent then to prove that he had such a conversation and what it was. We suppose it will not be denied that if the witness in positive and unequivo- terms denied that he had any conversation with the party named at any time, that the party would not be required to go farther and inquire whether he did not say so and so in a conversation which he positively denies that he ever had.

By his denial that he had any conversation with the party named he relieves the party from the necessity of inquiring into what he said in the conversation. So when all the circumstances of time, place, person and the subject matter of the conversation fail to bring to the memory of the witness the fact that he had any such conversation the party is not bound to hunt up all the details of a protracted conversation and repeat it to him and call upon him to admit in detail each and every statement that he is supposed to have made. In all cases reported not one can be found where the party attempted to lay the foundation for proving contradictory statements of the witness when the foundation laid has been held insufficient. The question has always been whether contradictory statements can be proved without laying any foundation. And then it is generally said by the court that the witness must first be asked whether he said the thing which it is proposed to prove he said.

But whether Robinson's evidence was properly admitted or not the verdict was right upon the other evidence reported. In this connection it will be convenient for us to consider the error assigned in the refusal of the court to set aside the second verdict, because it was not sustained by the facts proved or the evidence given on the trial. The evidence on the two trials is substantially the same, except that the evidence of John W. Hedges was given on the second trial and not on the first. If the court is of opinion, from the facts proved or the evidence given, that the verdict in both trials should have been for the defendant the court will set aside the second verdict and render judgment on the first. It would be idle to send the case back for another trial when the court has before it two verdicts, upon either of which they can render judgment for the party which, upon the law and the evidence, they think entitled to it. Although the property in controversy was personal property, yet it is perfectly apparent that the title to it depends upon the *bona fide* of the sale of the farm. If the sale of the farm was void as to the creditors of course the crop in the ground and the stock on the farm remained also subject

to the claims of creditors. Because the sale of the farm and the pretended agreement for its use and occupancy were all one transaction and they must stand or fall together. The undisputed facts in the case show that the sale was fraudulent. It had all the badges of fraud which ordinarily accompany a fraudulent sale. If the conveyance of the land and sale and assignment of the personal property was made by E. G. Hedges for the purpose of preventing it from being taken in execution for the payment of his debts, and John W. Hedges knew at the time of his purchase that this was the object of the sale, the sale is fraudulent and void. Virginia Code of 1860, chap. 118, sec. 1, p. 565.

In the case of *Garland* vs. *Rives*, 4 Rand., 282, it was held that when a deed of trust was executed to one creditor to secure the payment of his debt, and he had notice of other liabilities of the grantor, and the deed contained provisions which were calculated to delay and hinder other creditors, the deed is fraudulent and void as to the other creditors.

In the case of *Lang* vs. *Lee et al.*, 3 Rand., 410, it was held that where a deed reserves to the grantor a power inconsistent with the avowed object of the deed it will be null and void against creditors and purchasers.

In the case of *Briscoe et al.* vs. *Clarke*, 1 Rand., 213, it was held that, "a deed may be fraudulent if executed with a fraudulent intent, although founded on a valuable consideration."

This case is analagous in its facts and identical in principle with the case at bar. It was a conveyance of personal property by deed, with a reservation of a life estate to the grantor. In the case at bar the sale of the personal property was by parol, with an agreement that it was to remain in the possession of the seller for an indefinite time.

In the case of *Wright* vs. *Hancock et al.*, 3 Munf., 521, it was held that a sale and assignment by a debtor in failing circumstances to one creditor to secure the payment of his debt, the debtor remaining in possession disposing of the property and collecting the debts, was fraudulent as to other creditors.

In the case of *Washington and Alexandria* vs. *Deneale*, 2 Munf., 341, it was held that a sale of personal property by a bill of sale absolute on its face, the property remaining in possession of the grantor was *per se* fraudulent and void. This case goes on all fours with the case at bar. The purchasers were creditors of the seller, and the sale was intended as a security for the payment of the debts. The sale was of all the personal property of the debtor. So here the sale was of all the personal property of the debtor, the debtor remaining in possession.

The same doctrine was held in the case of *Thomas* vs. *Soper*, 5 Munf., 28.

In the case of *Fitzhugh* vs. *Anderson et al.*, 2 H. & M., Judge Roane says, p. 303: "The general principle arising out of the decisions is that of an unqualified contract, whereby the possession of goods remains in one man and the right in another, is fraudulent." This was a case of a loan of slaves by a father to his son which were levied on for the son's debts.

The same doctrine was held by the supreme court of the United States in the case of *Hamilton* vs. *Russell*, 1 Cranch, 309. This case arose upon an absolute bill of sale for a slave, executed and recorded in Virginia. The courts of Virginia have uniformly maintained the doctrine that the possession of personal property by the seller after an unconditional sale, is conclusive evidence of fraud in all its sternness and integrity.

The case of *Edwards* vs. *Harbine*, 2 Term, 487, strongly illustrates the inflexibility of this rule. Harbine took an absolute bill of sale upon a stock of goods to secure the payment of a debt and agreed verbally that if the debt was not paid in fourteen days he should then take possession of the goods, the debtor to remain in possession until the expiration of the time. Before the expiration of the fourteen days the debtor died. It was held that the sale was fraudulent and void, and the goods went to the administrator of the debtor's estate for the benefit of general creditors. But the facts in the case at bar are inconsistent with the idea that

the crops, stock and farming utensils on the farm could
have passed to John W. Hedges. The case sought to be
made out is that Enoch sold the farm and the stock, crops
and farming utensils upon it, to John, for about 8,000 dol-
lars. That Enoch was to remain upon the farm, have pos-
session of the personal property, and that out of the pro-
ceeds and profits of the farm he was, 1st, to appropriate so
much to his own use as was necessary to support his family.
2d. To pay John an amount equal to six per cent. upon the
purchase money as rents. 3d. The residue was to belong
to Enoch. The substance and legal effect of this agree-
ment was that the proceeds and profits of the farm should
belong to Enoch, and that he should pay John six per cent.
upon the purchase money, provided the profits amounted to
that sum after supporting Enoch's family. Certainly so much
of the proceeds of the farm as was necessary to support
Enoch's family was the property of Enoch, and might be
levied on for the payment of his debts. And how could he
pay John his six per cent. upon his purchase money except
by the sale of the crops and the proceeds of the farm? They
must be his or he could not sell them. The purchaser from
him could acquire no title if the property sold did not be-
long to him. Admitting, therefore, for the purpose of the
argument that the sale of the farm was in good faith, still
the arrangement for the cultivation of it and the payment
of the rents, made the crops and proceeds and profits of it
the property of Enoch and subject to levy and sale for the
payment of his debts. The wheat crop was in the ground
at the time of the supposed sale, and was harvested by
Enoch, and was in his possession to be disposed of by him
to enable him to support his family and pay his rents. The
oats was sown and harvested after the supposed sale, and
was in the same condition. The horses were purchased by
Enoch in November, 1865, before the supposed sale of the
farm. It is true that the money borrowed to buy them with
was secured by an order on John; but that does not make
the horses John's property. If Enoch had given his note
and John had paid it, it would have been the same thing,

and it will hardly be claimed that if John paid Enoch's debts for borrowed money that that would give him a title to the property Enoch bought with the borrowed money. But the sale of the farm was fraudulent and void as to the creditors of Enoch. It has all the ordinary badges of fraud. The parties are brothers. John is a Methodist preacher, living in Baltimore, who had no use for the farm. He had no money to buy it with, but says he bought it with his wife's money. It is not such an investment as he would be likely to make with his wife's money, if he were looking only to income and safety. Enoch was confessedly hopelessly embarrassed. His confessed object in selling was to prevent it from being taken for liabilities he had incurred while in the rebel army. That he told his brother John that he was "gone up." Enoch has remained in possession of the farm using and cultivating it just as he did before the sale. That he expects to remain on it as long as John will let him. Enoch is to pay six per cent. on the purchase money for rents if the profits will enable him to do so after supporting his family. We have no doubt but the deed is merely intended by the parties as a security. "If a conveyance be upon good consideration and *bona fide* it is valid. It is not sufficient that it be upon good consideration *or bona fide*. It must be *both*." 1 Story's Eq., sec. 353, 369.

"Whether a transaction be fair or fraudulent is often a question of law; it is the judgment of law upon facts and intents." Lord Mansfield in *Slader* vs. *DeMattos*, 1 Burrows, 474.

"A deed fraudulent on the part of the grantor may be avoided though the grantee be a *bona fide* purchaser and ignorant of the fraud." *Hildreth* vs. *Sands*, 2 Johns. Chy. Rep., 42.

The case of *Hildreth* vs. *Sands*, above referred to, is almost identical with the case at law. The vendor and vendee were brothers. The grantor was indebted to the grantee, and the grantee assumed the payments of other debts of the grantor in part payment of the purchase money. The grantor remained in possession. The grantor claimed

to be acting as the agent of the grantee in the occupancy and control of the property.

In 2 Bulstrode, 225, *Stone* vs. *Graham*, Lord Coke says: "If a man mortgage his land and continues in possession it is no disseisin, but if the conveyance be absolute and a continuance in possession it shall be adjudged in law fraudulent, for it has the face of fraud."

In the case of *Sanders et al.* vs. *Condenese et al.*, 4 Johns., 536, it was held that, "when a deed is void for fraud it is to be considered void *ab initio* and not allowed to stand as security to the grantor for advances he may have made or responsibilities he may have entered into on account of it." See also *Crimbaugh* vs. *Kugher*, 2 Ohio State Rep., 373; *State* vs. *Starn*, 1 Ohio Rep., 321; *Brice* vs. *Myers*, 5 Ohio Rep., 121; *Lake* vs. *Dand*, 10 Ohio Rep., 415.

The seventh assignment of error is that the court erred in permitting the defendant to give the record of his deed in evidence without accounting for the absence of the original. The Virginia Code, chap., 121, prescribes the mode of proving and acknowledging deeds for record, and makes it the duty of the clerk to record them. Chapter 176 of the Code provides for deeds not recorded in two years and foreign deeds properly authenticated being offered in evidence or proved by copy of the record. But there is no provision for offering in evidence the record of a deed executed and recorded in the State. A deed is private paper and the record of it is not a public record. The record of a deed is simply a copy of it made in a book. Still it is a copy and stands upon the footing of a copy which cannot be given in evidence until the absence of the original is satisfactorily explained and accounted for." *Rowletts* vs. *Daniel*, 4 Munford, 478; *Baker* vs. *Preston*, Gilmer, 286.

The eighth error that, the witness was allowed to testify to the contents of a schedule of personal property sold to John W. Hedges by Enoch Hedges, with the value at which it was appraised by the witness, was error upon the well settled principle that parol evidence of the contents of a

writing cannot be given in evidence until the absence of the paper is accounted for.

The eighth error is that E. G. Hedges was allowed to testify to a parol agreement made at the time of the sale of the farm that the purchaser was to have the wheat crop in the ground. As between vendor and vendee growing crops pass to the purchaser with the land; they are part of the realty. Hence by the statute of frauds no parol agreement for the sale of them can be valid. All parol contracts for the sale or incumbrance of real estate or any interest in it are illegal and void.

The ninth error that, John W. Hedges was permitted to testify, depends upon the law of last winter, making parties competent witnesses. The 4th clause of the 2d section of this act is so peculiar that it is difficult to know precisely what it means, or what could have been the object of the legislature in passing it. So far as we can ascertain there is no similar provision in the law of any other State. It could not have been that the law might subject a party to costs, which might have been incurred before its passage, because no new trial can be had except upon the payment of costs. If it is to have a sensible construction we suppose it must be held that where a trial has been had and a new trial granted the parties shall not testify. Whether a judgment shall have been entered upon the verdict before the new trial is granted is really a matter of accident in nine cases out of ten, and cannot be of the least possible importance to the parties. It is desirable that the question should be settled in some way and it is probably of not much importance how.

The objection to the deed from E. G. Hedges to J. W. Hedges goes first to the time it was offered and second to the proof of its execution. It was only competent as evidence in chief after the plaintiff had rested, and the defendant was engaged in delivering his evidence to the jury. The court had no right to break in upon his examination to give the plaintiff an opportunity of patching up his case. We know of but one mode of proving the execution of a

deed and that is by proving the handwriting of the grantor. If it is an ancient deed and the handwriting of the grantor cannot be proved it may be proved by proving the handwriting of the subscribing witness. Or if it is very ancient, comes from the proper depository, and has the appearance of fairness, it may go in evidence without proof of execution, or rather it proves itself. No reason consistent with the presumption of fairness can be given why its execution was not proved. The grantor and grantee were both witnesses in the case and might have been called upon to prove its execution. The recorder knew nothing about the execution of the deed and was not acquainted with the handwriting of the grantor. The endorsement upon it is all that is proved. His inference is of no importance. It may be drawn by the court or jury as well as the witness. It, therefore, comes to the question whether proof of the handwriting of the officer before whom a deed is acknowledged is sufficient proof of the execution of a deed. No authority can be found to support such a proposition. The remaining errors assigned are substantially embraced in the discussion of the proposition that the record shows that the sale of both the land and the personal property are fraudulent and void as to creditors.

*Charles J. Faulkner* on behalf of the defendant in error.

1st. The circuit court did not err in setting aside the verdict of the jury and granting a new trial at the December term, 1867. Illegal evidence, sufficient to control the verdict, had been permitted to go before the jury in the progress of that trial. Exceptions were taken to the admissibility of the evidence, and so satisfied was the court on the following day, that the evidence was improperly admitted, for that reason *alone,* it set aside the verdict and granted a new trial.

The testimony of James W. Robinson, the witness referred to, was improper evidence to go before the jury, not only for the specific purpose for which it was offered, but for any purpose whatever. It embraced a tissue of declarations

made by the vendor months after the sale and conveyance of his land, which 'upon no principle of evidence should have been allowed to prejudice the rights of the vendee. No rule of evidence being better settled, than that declarations made by the person under whom a party claims, after *the declarant has parted with his right*, are utterly inadmissible to affect any one claiming under him. 3 Phillip on Ev., 655–6, and the numerous cases there cited.

Neither was the testimony admissible for the professed object for which it was introduced, to wit: to impeach the evidence of E. G. Hedges—1st, It is only in matters that are relevant to the issue, that the witness can be contradicted. The conversations of the witness with James W. Robinson, in the summer of 1866, could have no possible relevancy to the issue here involved. 2d. If the matter was relevant no foundation for impeaching the witness was laid. It is not sufficient to ask the general question which was asked in this case, but particular statements should have been specified, such as might have brought the conversation to his remembrance. 1 Greenleaf Evidence, sec. 462; *Angus* vs. *Smith*, 22 English Common Law Reports, p. 360. Again, a witness cannot be called to contradict another with respect to a statement suggested to have been made, if there be not an *express denial* by the party supposed to have made it, of his having done so. 38 English C. L. R., p. 225. In this case there was no denial, but simply a failure to remember the general conversation referred to.

1st. The court did not err in setting aside the verdict and giving a new trial at the December term, 1867, as the facts certified by the court showed that the plaintiff was entitled to recover, and that the verdict rendered in favor of the defendant was against the law and evidence of the case.

3d. The court did not err in allowing the recorded copy of the deed from Enoch G. Hedges to John W. Hedges to go as evidence before the jury. The recorded copy had been used on the former trial without objection, and no notice had been given to produce the original. Besides it has been well settled by our court, that a copy of a deed,

certified by the clerk to be a true copy, is admissible as primary evidence, equivalent to the original.    *Baker* vs. *Preston and others*, Gilmer's Reports, p. 235.

4th. The court did not err in permitting the plaintiff at a subsequent stage of the cause to produce the original deed in evidence.   When the copy was objected to, the original was in Baltimore; it was despatched for; and although its subsequent production was wholly unnecessary to the plaintiff's case, such production cannot be a ground of error.

5th. The court did not err in permitting parol evidence of the understanding between vendor and vendee, that the wheat crop should pass to the vendee with the land.    The wheat crop then in the ground was conveyed to the vendee by the deed of the 17th February, 1866.    It was attached to the freehold and passed with the land.    This testimony was introduced simply to repel fraud and to show that the *intention* of the parties harmonized with the legal instrument and with the conclusions of the law.    It did not violate the rule of evidence "that parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid, legal instrument."    1 Greenleaf, sec. 275.    It neither contradicted nor varied the terms of the deed.

6th. The court did not err in allowing the plaintiff, John W. Hedges, to testify as a witness in the cause.    No judgment, prior to his being called as a witness, had ever been rendered in this case for plaintiff or defendant.    Acts of 1868, chap. 14, p. 10.

7th. The court did not err in refusing to set aside the verdict rendered at the March term, 1868, in favor of the plaintiff, as the facts certified show conclusively that the plaintiff was entitled to recover the full amount awarded to him by the verdict of the jury.

BROWN, President.   This was an action of debt by John W. Pitzer, sheriff, for the use of John W. Hedges, against Robert K. Robinson, on a bond, with collateral conditions, to indemnify the said sheriff for levying an execution in favor of the said Robinson against one Enoch G. Hedges on

certain property claimed by the said John W. Hedges.

The evidence showed that Enoch G. Hedges being the owner of a farm with a growing crop of wheat on it, &c., on it, and being also in debt to his brother and others for a valuable consideration, and, as far as the court can see from the evidence in the cause, a reasonably adequate one. That after the sale the vendor was to remain in possession as the agent of the vendee and carry on the business of the farm as such agent, for which he was to have his family supported out of the proceeds, and was also to have for his own use whatever remained of the proceeds of the crops after the vendee should be paid thereout, the legal interest on the cost. The horses requisite for the conduct of the farm were bought by said Enoch for the said John and paid for by orders on John, who paid the orders.

Enoch G. Hedges was examined on the first trial as a witness for the plaintiff.

The defendant Robert K. Robinson then introduced as a witness one James W. Robinson, who proved the statements of Enoch G. Hedges relative to the said sale and agency, made in a conversation had between the said Enoch G. Hedges and James W. Robinson long after the said transaction had taken place. This evidence was admitted to go to the jury by the court to discredit and contradict the witness, Enoch G. Hedges. There was a verdict for the defendant, which the court set aside and awarded a new trial upon the ground of its own error in permitting the said statements of Enoch G. Hedges to go to the jury for the purpose mentioned.

For the defendant, Robinson, it is claimed that the said evidence was proper to impeach the witness of the plaintiff, and, therefore, the court erred in setting aside the verdict for that cause, and further, that independently of that objection, the evidence was admissible in chief, and proper to sustain the issue for the defendant as the declaration of a party in possession of the property, the subject of controversy, which it was claimed constituted *prima facie* fraud.

But I am of opinion that there was no sufficient ground

laid for the admission of the statements of Enoch G. Hedges, for the purpose of contradicting him and impeaching his credit. Nor were his statements made, after the sale and conveyance and during his continuance as the agent and manager of the purchaser, evidence in chief either to disprove the purchaser's title or to establish fraud in the sale, since the other evidence in the cause fails to involve the transaction between the parties in such doubt and uncertainty, or raise a reasonable apprehension of collusion as would warrant a resort to the statements of the vendor after he had parted with the property though holding a possession consistent with the change of ownership.

There was no error, therefore, in setting aside the first verdict and awarding a new trial. Neither was there error in allowing the record of the deed from Enoch G. Hedges to John W. Hedges to go in evidence, without accounting for the original and when it was in the possession of the vendee, for the records are evidence, and if .they were not they would be worse than useless; and the deed was properly admitted to record.

Nor was there error in permitting parol evidence of the intention of the parties that the purchaser should have the growing crop, that being in harmony and not inconsistent with the deed.

Though it was irregular to permit the plaintiff to offer in evidence the deed from Enoch G. to John W. Hedges, after the plaintiff had closed his evidence, without having with the assent of the court reserved the privilege of doing so, and while the defendant was delivering his evidence to the jury, yet the propriety of doing so was a matter depending upon the circumstances of the case at the time, to be judged of by the court, and there is nothing in the record to show that the action of the court was not justified by the circumstances transpiring during the trial.

Though it is not necessary to stop the progress of the trial to prepare bills of exception, yet at least the point should be saved before the jury retires, and the bill may then be prepared and signed afterwards; but where excep-

tion is taken and the progress of the trial stopped for the purpose, and the bill is then prepared and signed, the parties may well rely on the case as thus made by the record and shape their course accordingly.

In such case it would not be error in the court after the verdict had been rendered to refuse to amend the bill of exceptions, notwithstanding in general where the exception has been taken before the jury retired, but the bill not drawn up and signed till after verdict, the court may correct the bill to conform to the truth.

There was no error in admitting John W. Hedges to be examined as a witness, because, there being no judgment, the case is not within the exception to the general rule provided in the statute. And the same point is decided in *Zink* vs. *Wilson—infra.*

There was no error in the refusal of the court to set aside the last verdict, because it was not contrary to the evidence so far as it appears in the record. The deed from Enoch G. to John W. Hedges is not made part of the record, though its admission as evidence was excepted to, but the parties have chosen to content themselves with the oral statements of the witnesses relative to the sale and transfer of the farm, growing crop, and the statement in the record that the deed was put in evidence. Had the deed been made part of the record in any bill of exceptions the court might more satisfactorily have judged of its contents. Taking the case as it stands there is nothing to show that the verdict was contrary to the evidence. Nor does it establish a case of fraud.

I think, therefore, that the judgment of the court below should be affirmed, with costs and damages to the defendant in error.

The remaining members of the court concurred.

JUDGMENT AFFIRMED.