# ·CHARLESTON.

## STAUFFER *v.* KENNEDY *et al.*

Submitted January 29, 1900—Decided March 31, 1900.

1. FRAUDULENT CONVEYANCE—*Evidence*

   Where a conveyance or deed of trust is given by a debtor to one who is a near relative, and thereby the debtor largely disables himself from paying his debts, and such conveyance or deed of trust is attacked as fraudulent by creditors, the party claiming under it must fully and clearly establish a valuable consideration for it.   (p. 711).

2 FRAUDLENT INTENT—*Evidence.*

   Fraudulent intent in a conveyance may be shown by either direct or circumstantial evidence, and such circumstantial evidence, though only circumstantial, is sufficient if it lead a reasonable man to the conclusion that such fraudulent intent existed. *Burt* v. *Timmons*, (2 S E. 780,) 29 W. Va. 441. (p. 712).

Appeal from Circuit Court, Berkeley County.

Bill by John Stauffer against Phoebe Kennedy and others.   Judgment for defendants, and plaintiff appeals.

*Reversed.*

D. C. WESTENHAVER and GEORGE W. JOHNSON, for appellant.

U. S. T. PITZER, for appellees.

BRANNON, JUDGE:

Prior to June 10, 1889, Robert Kennedy, with Samuel Kennedy as his surety, executed promissory notes to Israel Reiff for seven hundred dollars as purchase money for a saw-mill sold by Rieff to Robert Kennedy.   On June 10, 1889, Samuel Kennedy made a deed of trust to secure to Phoebe Kennedy the sum of one thousand five hundred dollars upon a tract of land in Morgan County.   On August 8, 1893, the administrator of said Reiff recovered a judgment against Robert and Samuel Kennedy upon the

said notes to Reiff for six hundred and twenty-two dollars and two cents and costs. The judgment of Reiff's administrator against the Kennedys came by assignment to John Stauffer, and in 1897 he brought this chancery suit in the circuit court of Berkeley County against Phoebe Kennedy and others to subject to the payment of said judgment a tract of land in Berkeley County, which had been sold under a deed of trust by Ingles, as trustee, and conveyed by him to Phoebe Kennedy, the bill charging that the land was paid for with the money of Samuel Kennedy, that it was really his land, that it had been conveyed to Phoebe Kennedy only to shelter it from the said judgment as a debt of Samuel Kennedy, and in fraud of said judgment. The court dismissed the bill, and Stauffer appealed. The tract of land in Morgan County, called the "Harper Land," belonged to Samuel Kennedy. He went security for his brother, Robert, on said notes. One of the notes became due, and Robert Kennedy was unable to pay all, but did pay some of it. This debt threatened Samuel Kennedy's little farm seriously, it being worth only one thousand five hundred dollars. It alarmed him. He was a bachelor in the 60's, living on the land in Morgan. His sister, a maiden lady, a few years his junior, lived with and kept house for him. She told him not to go security for Robert Kennedy, and seemed to be irritated that he had done so. In this state of things, when all knew that Robert Kennedy could not pay the debt, Samuel Kennedy sold and conveyed to John Stauffer the tract of land in Morgan County. When the deed was made, one thousand three hundred and twenty-two dollars of the purchase money was laid down on a table, when Stauffer, Phoebe Kennedy, and Samuel Kennedy, Jr., were all present; Samuel Kennedy, Sr., being at the house, but not being present in the room just at the time the money was laid upon the table. Morgart (who was also present, and who really furnished the money for Stauffer, as he had purchased the land from Stauffer after its sale to Stauffer by Kennedy) asked to whom the money should be paid, and Phoebe Kennedy said, "Pay it to little Sam," meaning Samuel Kennedy, Jr. He took the money, and handed it to Phoebe Kennedy. Some one suggested the prudence of putting the money in bank, and Phoebe

Kennedy then or shortly after committed one thousnd two hundred and seventy dollars of the money to the hands of her nephew, Samuel Kennedy, Jr., to take it and deposit it in bank, and on the next day he deposited it in bank, not to the credit of Phoebe Kennedy, but to the credit of Samuel Kennedy, his uncle. When he returned home he at once informed his aunt of this deposit, and the defense claims that she was dissatisfied with it, but it continued on such deposit from December 4th to December 16th, when Samuel Kennedy drew a check in favor of Samuel Kennedy, Jr., for the one thousand two hundred and seventy dollars, and the latter drew the money from bank, and paid it to Phoebe Kennedy, as he and she say. This check was dated the 16th of December, 1895. On January 14, 1896, the said sale was made by said trustee, Ingles, of the tract of land in Berkeley County known as the "Weller Land," and it was knocked down under a bid of five hundred and fourteen dollars and fifty cents made by Samuel Kennedy, Jr., who paid the cash, and directed the deed for the land to be made by the trustee to Phoebe Kennedy, and it was so made. It is this land which Stauffer claims is the land really of Samuel Kennedy, bought with his means, and only put in the name of Phoebe Kennedy to evade the said debt. I think there is no escape from this conclusion. Nobody questions, but evereybody connected with the case admits, that the purchase money used in paying for this land is the very same money which came from the sale of Samuel Kennedy's Morgan County land. But Phoebe Kennedy rests her defense—must rest it—solely on her right under the said deed of trust on the Morgan land. She says that her deed of trust, though not prior to the date of the notes on which Stauffer's judgment is based, is yet prior as a lien to that judgment, as it is, if valid. The whole case turns on the *bona fides* of that deed of trust. Is it a valid debt equal in merit to that of Stauffer? Or is it one trumped up on no solid basis, simply to defeat an honest debt of her brother? In 1875, Samuel Kennedy, who had been living in the West, returned to Morgan County, and went upon the farm of an aged brother-in-law,—Harper,—under a contract to support Harper and his wife in consideration that Harper

should convey the land to Kennedy. Kennedy did support Harper and his wife until their death, and thus derived the said Morgan County land, which he sold to Stauffer, as above stated. Phœbe Kennedy was poor, working about the country. When her brother went to take charge of this farm, she went upon the farm with him. There she made her home with her brother and with her sister, the wife of Harper; all in one family. She did housework unquestionably. Any sister would do that. Samuel Kennedy labored industriously upon the farm. He was a sober, industrious man. He was dead when this suit was brought. Phœbe Kennedy swears that when she went to live with her brother it was under the agreement that she was to have for her services in waiting upon the old people, Harper and wife, and doing general housework, two dollars and fifty cents per week, to be paid by Samuel Kennedy, besides her board, and the right to the marketing stuff on the place. This large reward is not very plausible. She needed a home, and it is more probable that she intended to charge nothing to her brother, but labored simply as one of the family, from love and affection, and not for money. Our common experience tells us this. That is natural and usual with plain country people in their condition of life. Under well-settled principles of law, this sister, far up in life, would be presumed to labor for her close blood kin and herself as well—for her home—without expectation of reward, without contract for reward, and against an honest debt of her brother she must indubitably establish, not merely that she did household service, but did it under express contract for pay. Besides, a neice, Johanna Downey, lived with them for fifteen years, and did much of the work, rendering it highly improbable that, in addition, Samuel Kennedy was under contract to pay Phœbe Kennedy the large wages claimed by her. Phœbe Kennedy is the strongest witness to sustain this alleged contract for the payment of her wages, but, of course, she is a party to this suit, and cannot give evidence in her own behalf of a personal transaction with her dead brother to charge him with a debt to the prejudice of his creditors. *Smith* v. *Turley*, 32 W. Va. 14, (9 S. E. 46). What other witnesses sustain this contract? Samuel Ken-

nedv, Jr., Robert Kennedy, and Johanna Downey, all very closely related, and moved by the strong motives of human nature to try to save the home for Phœbe Kennedy; and they only depose to declarations made by Samuel Kennedy not to the making of an explicit contract for such wages. We must remember that these transactions, deed of trust, and evidence are between close relatives, and the deed of trust was made under the alarm and distress overshadowing Samuel Kennedy and the only home which his aged sister had, caused by that unfortunate suretyship for his brother. Our cases on fraudulent conveyances are very rigorous on those claiming under them. This claim was an old debt running back fifteen years before the deed of trust. *Knight* v. *Capito*, 23 W. Va. 639, says that, if a conveyance be made by father to son in consideration of old debts, and it is impeached by creditors as fraudulent, the son will be held to stricter proof ot honesty than would a stranger. Many cases say that when a conveyance or deed of trust between close relatives is assailed by creditors as fraudulent, such relationship is a badge of fraud, and calls upon those claiming under it for full proof of all the essentials to sustain such conveyance, and throws upon them the burden of proof. *Burt* v. *Timmons*, 29 W. Va. 441, (2 S. E. 780); *Reynolds' Adm'rs* v. *Gawthrop's Heirs*, 37 W. Va. 3, (16 S. E. 364).

One circumstance against that deed of trust is that it bears date June 10, 1889, and was not acknowledged until September, 1890, recorded September 17, 1890. Why this delay, if it was a valid deed? This is a circumstance against its validity, a strong mark of fraud, when debts threaten. *Reynolds' Adm'rs* v. *Gawthrop's Heirs*, 37 W. Va. 8, (16 S. E. 364); Wait, Fraud. Conv. section 230. Why this delay? I ask again. The parties were uneasy, or, rather, Samuel Kennedy was, on account of this debt, and hardly knew what to do; was hesitating whether to put the deed on record or not; was in doubt. This is shown by the fact that he went alone to Girault, and had him to draw the deed of trust, and never delivered it to Phœbe Kennedy, as she admits, until after its recordation, and took it himself to the clerk's office and had it recorded, paying the fee. Phœbe Kennedy did not participate in all

this, was not present when the deed was made or re-
corded, says she did not see it until after it was recorded,
though she says her brother told her that he had made it.
Rather unusual conduct.   The matter rested until 1894,
when the sheriff went to levy an execution for this debt on
Samuel Kennedy's property, and then she set up a claim
to all the personal property on the farm.   She thus be-
came, instead of the servant of her brother, the owner of
every tittle of property he had on earth.   He was a com-
plete bankrupt in her favor.   How did she claim the per-
sonalty?   The fact that she did so, making her brother
utterly insolvent, tends to show strongly that her brother
had made her the safety deposit of all his property.   Turn-
ing to the deed of trust, we find that it conveys not only
the land, but also personal property, though it does not de-
scribe the personal property.   Thus this deed of trust
conveyed to her all he had, as the debt was probably fully
equal to realty and personalty in value.   Though not in-
volved in this case, yet it is a circumstance tending to
show that the sister was the safety deposit indicated above;
that in October, 1878, Samuel Kennedy made a deed to her
for three wagons, wheat fan, plows, harrow, three horses,
fifteen hogs, and all notes, bonds, and credits of every
kind.   What stress induced this unrecorded bill of sale
does not appear, but it is not without force in shedding
light on the deed of trust in question.   When a convey-
ance in favor of a relative leaves a man without means to
satisfy his creditors, it is the basis of a strong suspicion
of fraud; it is *prima facie* fraudulent, and calls upon the
grantee to furnish strong proof of *bona fides* of the trans-
action.   If a conveynce provides for near relatives at the
expense of creditors, the relatives must assume the bur-
den of proof, and make things clear.   *Reynolds' Adm'rs* v.
*Gawthrop's Heirs*, 37 W. Va. 3, (16 S. E. 364); *Burt* v. *Tim-
mons*, 29 W. Va. 441, (2 S. E. 780); *Herzog* v. *Weiler*, 24 W.
Va. 199. Now let us turn to the features or circumstances
of the debt claimed by Phœbe Kennedy.   It ran on from
1875 to 1889.   Much of it was barred.   If notes had been
given, it would tend to show that there was such a con-
tract for wages.   The fact that a large part of the debt
was barred is a circumstance against the honesty of the

debt; not conclusive, but a circumstance. _Knight_ v. _Capito_, 23 W. Va. 639; _Bank_ v. _Atkinson_, 32 W. Va. 203, (9 S. E. 175). Phœbe Kennedy herself says that she never received a cent for her work until she received the purchase money from the Morgan County land in December, 1895, in payment of her deed of trust. Why did she labor so long without pay, if she had a contract for pay? Add to these things the fact that the money which Phœbe Kennedy received from the sale of the Morgan County land was deposited in bank by her nephew, Samuel Kennedy, Jr., not to her credit, as it should have been, if her money, but to the credit of Samuel Kennedy, Sr., as it should have been, if his money. This deposit has strong import in this case. Young Samuel Kennedy was then twenty-four years of age, quite sprightly and intelligent, as is shown by his examination, and particularly by his altercation with an attorney on cross-examination. He lived very near his uncle Samuel, was, more than anybody else, acquainted with the affairs of his uncle and aunt, attended to their business, and, as the whole cast of this case shows, knew the true status of things concerning the matters involved. He knew that this deed of trust was only a sham to protect the land from this debt. Things cannot always be directly proven, yet the circumstances inferentially and logically may leave no doubt of them. Young Samuel Kennedy was present when the money was paid, and heard his aunt answer that it was hers, and he received the money for her, and went through the form of handing it to her, and afterwards, notwithstanding all this,—a few hours afterwards,—he received this money back from his aunt, and deposited it in bank to his uncle's credit. Why? Because he knew that it was his uncle's money. He and Phœbe Kennedy say that he was given no directions as to the deposit. Why not, if it was her money? "_Res ipsa loquitur._"

Looking to the circumstances of this alleged debt from Samuel to Phœbe Kennedy, it ran on fourteen years. She received nothing. Did they settle? Did he give notes to show indebtedness? Phœbe Kennedy says they made four settlements, and that Samuel gave her notes for amounts found due; but, when asked to produce them, she

said that the mice had eaten them up; yet the mice had not eaten the deed of trust up. She states that she kept a book containing the account between her and her brother. She was asked to produce it, but did not, saying she did not know where it was. Thus no memorandum of settlement or note in these many years comes forth to show that, as the years went along, these parties treated each other as debtor and creditor. The deed of trust refers not to these alleged notes, as it would be supposed to do, if they existed. They would be mentioned, so that each one would call for its interest. The trust is only for a lump sum of one thousand, five hundred dollars, "as evinced on this deed of trust as executed by the said Samuel Kennedy to the said Phœbe Ann Kennedy, made payable on the issuance of this deed of trust." Therefore there were no notes. This trust is the first memorandum of debt, and it was born in the presence of danger from this unfortunate suretyship, and Phœbe Kennedy says explicitly that a fourth note for three hundred dollars was made four years after the trust, and it is required to make up the one thousand, five hundred dollars. A strange circumstance. Where is that note? No such book of account was kept as Phœbe Kennedy says. She does not produce it. Neither she nor her brother Samuel could write. But she says that a brother, Hugh Kennedy, kept that book. He is dead. Johanna Downey, the niece, a member of the family for fifteen years, says that her aunt showed her the deed of trust, but said that she was never shown any notes, and never saw any account book; that her aunt kept no account book, and that she never saw Hugh Kennedy do any writing for his brother and sister. Robert Kennedy says that his sister showed him the deed of trust, but never showed any notes. Strange that she would not show the notes also, if they existed, unless they had been eaten up by mice.. And just here I note what seems to me to be important in the evidence of Robert Kennedy. He says that in 1894 his sister gave him this deed of trust to show it to a lawyer to see if it was good. Kennedy was asked whether the reason for consulting a lawyer about the trust deed was not because Samuel Kennedy was a security for Robert in the sawmill

debt, and answered: "Well, I don't know whether I can make any such statement or not. It has been a good while ago." Phœbe Kennedy was poor. She had once made her home mostly with her sister, Mrs. Harper, and worked about the country. Evidence shows that she had no personal property; that until the year 1894 she was assessed with none, but that she was assessed with one hundred and forty-three dollars that year, fifty dollars in 1895, and nothing in 1896. She had no land until the Weller tract was put on the land book in 1896. It is to be noted that it was in that year, 1894, when the sheriff went with the execution to levy on property of Samuel, that Phœbe set up a claim to all the personalty, and it was put on the tax books to her for the first time that year. She says that she had four hundred dollars in money. Nobody ever saw it. She says she lent it to Samuel. She is not competent to prove this. If she lent it, that loan and her wages would make much more than one thousand five hundred dollars secured by the trust. Is it likely that she remitted anything to her brother?

I have above stated the case substantially without reference to the evidence adduced by the plaintiff, on the case as made by the defendant; and, considering the principle of law well settled in this State, that where a debtor conveys to a near relative valuable property, disabling himself from paying his just debts, and the transfer is assailed by creditors, the party claiming under that transfer must show clearly the consideration, the fair, honest consideration, I may say fairly that Phœbe Kennedy fails to meet this requirement, and her case fails. There are too many circumstances of suspicion. Remember that our decisions, in a case like this, where the transaction is between close relatives, and where the evidence to sustain it comes entirely from close relatives, look askance upon the transaction and its supporting evidence. The party claiming under that transaction carries the burden of proof, but, even if the burden were on the shoulders of the plaintiff, we must not carry the rule that fraud is never presumed, but must be fully proved, too far. We must not require evidence of fraud beyond reasonable doubt. If we do this, fraudulent conveyances and covinous transactions will walk.

triumphant over the just right of others; a premium will be given to fraud. The distinguished and lamented JUDGE GREEN, in *Burt* v. *Timmons*, 29 W. Va. 460, (2 S. E. 791),. said, in enunciating the true principle: "I suppose that the real trouble in reaching correct decisions in these cases is that the rules of law which have been laid down have been misapprehended, though this Court has endeavored to make them clear. Yet some seem still to think and act as though to establish fraud in cases like the one before us required evidence almost as strong as the evidence required to convict in a criminal prosecution; and when fraud is established by direct proof or necessary inference, they seem to think that the slightest evidence ought to be regarded as sufficient to explain and rebut the facts which establish the fraud. It is hoped that these erroneous views will be abandoned; for, if they prevail, our married woman's act and acts permitting interested witnesses and parties to testify, and husbands and wives to testify for each other will be utterly perverted from the purpose for which these acts were passed, and they will become the fruitful source of fraud and perjury. These acts were not designed, and the courts should not permit dishonest debtors to use them, to defraud their honest creditors, and to retain their property for their own use by withdrawing it from their creditors by fraudulent investments of it in the name of their wives. This practice is. becoming too common, and should be strongly discountenanced by the courts. It cannot be effectually checked, so. long as the false views necessary to establish fraud in such cases, and to rebut it, when *prima facie* established, are: abandoned." The State owes a large debt of gratitude to. JUDGE GREEN, not only for the great and laborious research and the notable ability characterizing his luminous opinions when the law of this State was in a formative condition, which opinions stand as guiding precedents, but also for the high morality and business honor spoken in those opinions. The same principles as quoted above touching the amount of proof to sustain the charge of fraud are contained in numerous decisions of this Court. *Goshorn's. Ex'r* v. *Snodgrass*, 17 W. Va. 717. In *Reynolds' Adnr's* v. *Gawthrop's Heirs*, 37 W. Va. 3, (16 S. E. 364), the syllabus

says: "While the burden of proving a deed fraudulent in fact as to credtiors is upon them, positive evidence of fraudulent intent is not required, but it may be deduced from the circumstances of the transaction, and the relation and situation of the parties to it and to each other. Circumstantial evidence, if adequate to satisfy the court of such fraudulent intent, is sufficient, and often the only evidence obtainable."

I now turn to the evidence adduced by the plaintiff to support his cause. It makes the *prima facie* case left by the defendant's evidence conclusive. Bassore says that he was present at the sale of the Weller land, and that Samuel E. Kennedy, called above Samuel Kennedy, Jr., told him that he was buying the land for his uncle Sammy Kennedy. Bassore is disinterested. Shriver, who is also disinterested, lived a near neighbor to Phœbe and Samuel Kennedy, in Morgan County, for manv years, and was well acquainted with them and their business. He says that Phœbe never owned any property. He says that both Samuel Kennedy and Phœbe Kennedy told him that their nephew had bought the Weller land at the trustee's sale for Samuel Kennedy. Shriver worked on the Weller farm for Samuel Kennedy in making permanent repairs, and was paid by Samuel for it. He also says that after the sale of the Morgan land he heard that Phœbe Kennedy had some money, and he asked her for a loan, and she replied that she had no money to loan. There is some question whether she said she had no money, or no money to loan; but it is evidence either way. In fact, she admits this conversation, and says that she told him that she had no money, but says it was before she received that money, whereas he says it was afterwards. Stauffer, the plaintiff, gives important evidence. He says that when he informed Samuel and Phœbe Kennedy that he was ready to pay the balance of the purchase money, they seemed uneasy about something, and that he thought then of the Reiff judgment, and it occurred to him that they feared that it was a lien on the land and that he would retain its amount out of the purchase money to meet it, and that he then stated to them that an attorney who had examined the title said that there was nothing against the land but Phœbe Kennedy's deed

of trust, and that he (Stauffer) thought that, as the Reiff estate had been settled up, as he had heard, there would likely be no trouble about that judgment, and that then they grew easy, and stated to him that the deed of trust to Phœbe Kennedy was given to save Samuel from the Reiff debt, and blamed Robert Kennedy for getting Samuel into the trouble, and that there was no obligation from Samuel to Phœbe Kennedy. Now, if this evidence were inadmissible because of Samuel's death, yet it is admissible against Phœbe Kennedy as to her own declarations, and also as to those of Samuel Kennedy, if we were to read her deposition in her behalf. Her deposition, though not admissible in her behalf, would be admissible as admissions against herself. The natural feelings of sympathy for Phœbe Kennedy have inclined me from the first to sustain her in this case, but law, under the facts, calls in another way; very plainly calls, as I see the case, to vindicate the rights of an honest creditor against a colorable transaction, a ficticious debt, trumped up in the hour of distress to defeat a creditor. We must, therefore, reverse the decree, and hold that the cause is for the plaintiff, and remand the cause to the circuit court, with directions to it to enter a decree for the debt of the plaintiff, and subjecting the land to its payment.

*Reversed.*