# CHARLESTON.

Colston, *et al., Adm'rs. v.* Miller.

Submitted February 23, 1904—Decided March 29, 1904.

1.    FRAUDULENT CONVEYANCE.

     Retention by the grantor of the possession of real estate conveyed by him with intent to defraud his creditors is a badge of fraud, and casts upon the parties the burden of showing that the grantor is holding in good faith under the grantee as his tenant or consistently with the deed. (p. 497.)

2.    FRAUDULENT CONVEYANCE—*Tenant.*

     When, in case of such retention of possession, the grantee, in an attempt to prove such tenancy, discloses acts of his own, in respect to the crops raised on the land by his alleged tenant, inconsistent with fairness and good faith toward the creditors of the grantor, he thereby not only fails to repel the inference of fraud arising from the act of permitting the grantor to remain in possession, but establishes an additional circumstance tending

to show participation on his part in the fraud of the grantor. (p. 500.)

3. FRAUDULENT CONVEYANCE.

When a conveyance is attacked by creditors of the grantor on the ground of fraud, the burden is upon the grantee to prove full payment of an adequate consideration for the property, and, if it appear that, in addition to the land, he received from the grantor certain choses in action, his failure to show such payment of such consideration for the assignment of such choses in action as well as part of the alleged purchase money of the land, is potent evidence of fraud in the entire transaction. (p. 501.)

4. FRADULENT CONVEYANCE—*Consideration.*

To sustain the claim of payment of consideration in such case, when the amounts are large, the testimony of the grantee, if uncorroborated by receipts, memoranda, or other documentary evidence, must be clear, positive, definite, consistent with other evidence offered by him, and free from self-contradiction. (p. 502.)

5. FRAUDULENT CONVEYANCE—*Relationship.*

Relationship between the parties, by blood or affinity, calls upon the court for careful and close scrutiny of the transaction and the conduct of, and evidence offered by, the grantee. (p. 496.)

6. FRAUDULENT CONVEYANCE—*Sets-Off.*

Failure to allow sets-off is not cause for reversal of a decree at the instance of a party who did not ask for, or rely upon a claim to, them in the court below. (p. 506.)

7. FRAUDULENT CONVEYANCE—*Creditors.*

When a conveyance is decreed to be fraudulent upon a bill filed by a single creditor of the grantor and no other creditors have questioned it and it does not appear that there are any others, it is unnecessary and erroneous to order a convention of the creditors of the grantor. (p. 507.)

Appeal from Circuit Court, Berkeley County.

Bill by William B. Colston, administrator and others against Maria E. Janney and others. Decree for plaintiffs, and defendant, Victor D. Miller, appeals.

*Affirmed.*

FOREST W. BROWN, for appellants.

FLICK, WESTENHAVER & NOLL, and INGLES & NADENBAUSCH, for appellees.

POFFENBARGER, PRESIDENT:

Victor D. Miller obtained this appeal from a decree of the circuit court of Berkeley county, declaring a certain deed, executed by Chas. S. Lamon and wife, and purporting to convey to him a tract of land containing 210 acres, 2 rods and 19 poles in consideration of $5,262.50, to have been made with intent to hinder, delay and defraud the creditors of the said Chas. S. Lamon and setting the same aside as to the debt due the plaintiffs, Wm. B. Colston and Geo. M. Bowers, administrators of Robert Lamon, deceased.

This debt originated in the following manner: John W Lamon, on the 13th day of May, 1893, made his negotiable promissory note for the sum of $4,000.00 to become due and payable four months after its date, which was endorsed, first, by said Chas. S. Lamon, secondly, by said Robert Lamon, thirdly, by G. M. Lamon, and then delivered for value to the National Bank of Martinsburg. At that time, said John W. Lamon must have been in failing circumstances, as he afterwards made an assignment for the benefit of creditors, and only a small portion of the debt was afterwards collected out of his estate, and the balance was paid out of the estate of Robert Lamon. Chas. S Lamon was then the owner of said farm which was worth not less than $5,000.00 and personal estate consisting of live stock, farming implements, choses in action and other property worth about $4,000.00. By deed dated May 22, 1894, he conveyed the farm as aforesaid to the appellant, his wife's brother, and assigned to him at about the same time two notes calling for considerable sums of money. On or about the date of the conveyance of the farm, he placed his personal property in the hands of his wife, executing to her a bill of sale thereof, and she converted the same to her use.

Out of the estate of Robert Lamon, there was collected on said debt by legal process, $1,349.21 February 3, 1898, $632.26, January 30, 1899, and $679.97, May 4, 1899, and thereupon the administrators of the estate of said Robert Lamon brought this suit for the purpose aforesaid, he having been the second and Chas. S Lamon the first, endorser on the note, in consequence of which said Chas. S. Lamon was liable to him for the amount so paid. Proceedings were then had which re-

sulted on the 19th day of August, 1902, in the decree complained of.

The court is said to have erred in overruling the demurrer to the original bill. `This is no doubt true, as it failed to aver any notice to the defendant Miller of the fraudulent intent charged upon his grantor, or participation therein on his part. But the plaintiffs, perceiving this error, cured it by filing an amended bill in which the necessary allegations omitted from the original are fully supplied. The only effect of sustaining the demurrer would have been to cause an amendment of the bill to be made. The voluntary amendment is certainly as effective as a compulsory one would have been. Hence, the error is clearly harmless. Nor should the demurrer have been sustained on the ground of *laches,* as the suit was instituted immediately after the making of the final payment of the debt, until which time no cause of action as to it arose. As the cause of invalidity, if any, is fraud and not mere want of consideration, the statute of limitation does not apply, and the bill does not disclose such lack of diligence as will bar. If the charge of fraud is sustained, the defendant cannot well say he has been misled or prejudiced by slight delay on the part of the man upon whom he perpetrated the fraud, and the rights of no third party have intervened.

The record abounds with both circumstantial and direct positive evidence of fraudulent intent on the part of the grantor Chas. S. Lamon. Declarations of his intent and purpose to convey the farm to the defendant Miller to escape the payment of said note, are testified to by witnesses, and his subsequent conduct and declarations are tantamount to admissions. Had exceptions to these declarations been taken and the benefit thereof saved, some of them were not admissible against the defendant Miller, because not made in his presence. *Robinson* v. *Pitzer,* 3 W. Va. 335; *Houston* v. *McCluney,* 8 W. Va. 135; *Crothers* v. *Crothers,* 40 W. Va. 169. But the orders entered in the cause do not show that any objection was made or exception taken at the hearing, and the rule is that except in the case of inadmissibility because of incompetence of the witness, objections of this kind, not made in the court below, are deemed to have been waived and will not be entertained on appeal. *Miller* v. *Gillispie,* decided at the last term; *Vanscoy* v. *Stinchcomb,* 29 W. Va. 271; *Hill* v. *Proctor,* 10 W. Va. 78. How-

ever it would be absurd to allow such declarations any proba-
tive effect against one who never heard them, and unless the
other evidence in the cause will support the finding and decree,
it cannot stand. Prior declarations of the grantor are admis-
sible against him, but they do not prove notice to the grantee,
unless heard by, or communicated to, him. *Bishoff* v. *Hartley,*
9 W. Va. 100. Subsequent declarations of the grantor are gen-
erally inadmissible. 14 Am. & Eng. Enc. Law (2 ed.) 495. Such
declarations relating to possession inconsistent with the deed
are admissible. 14 Am. & Eng. Enc. Law (2 ed.) 497.

Miller sets up in his respective answers to the original and
amended bills, and proves by the depositions of himself and
his attorney Col. Buchanan Schley, of Hagerstown, Md., as
well as by the checks themselves, that, on the 16th day of June,
1894, he gave Chas. S. Lemon his three checks for sums aggre-
gating $4,600.00 all of which were passed through the banks as
paid. Two of them were drawn on the Hagerstown Bank, one
for $3,000.00 and the other for $600.00 and Mr. Schley testi-
fies to having gone with Lamon to that bank for the purpose of
identifying him, and seen the money for which they called actu-
ally paid to Lamon The other was for $1,000.00, dated June
16, 1894, drawn on the Second National Bank of Hagerstown,
endorsed by Chas. S. Lamon, and stamped as having been paid
June 19, 1894, but credited in the bank book as of the 16th.
Miller and Schley say a medical account of $235.00 due from
Lamon to the former who is a physician and had been treating
Lamon, was credited on the purchase money. As to the resi-
due of $427.50, the two witnesses to the consummation of the
alleged sale differ in their testimony. Miller says in his answer,
and also testifies, that he paid the balance in cash, part of it on
the same day, and the balance $250.00, at Lamon's home some-
time afterwards, in the presence of Charles Stuckey, whom he
admits he had called as a witness to the transaction. Colonel
Schley says that no money was paid in his office and that the
difference between the aggregate of the checks and medical ac-
count and the total amount of purchase money is represented by
an indebtedness due from Lamon to Miller which was deducted
by him with the medical account to ascertain the amount for
which the checks were drawn. His testimony is as follows:
"I put down at his suggestion what the farm came to per

acre, which I do not now recall, subtracted from it the bill which he owed Dr. Miller, which amount he gave me at the time, the money he said he had borrowed from Dr. Miller, and subtracted those from what I was told he would give for the farm, and told the Doctor and himself the balance that was due on the purchase money. For this amount, namely, the balance due, Dr. Miller gave these checks which I have referred to." This he substantially reiterates once or twice.

That said sum of $4,600.00 was paid by Miller to Lamon as aforesaid admits of no doubt, but neither this fact nor the payment of the whole amount of purchase money, if established, will sustain the transaction if the grantee participated in the fraudulent intent of the grantor in disposing of the property. Payment of the purchase money alone is not enough. The transaction must have been free from fraud on the part of the grantee. There is but little evidence other than that which is circumstantial, tending to show a fraudulent purpose on the part of Miller, and that is in the nature of an admission made some time after the purchase. William Barber who had worked for Lamon as a farm laborer before and after the conveyance and also for Mrs. Lamon after the death of her husband, testifies to a conversation which he says occurred between Dr. Miller and his sister, Mrs. Lamon, in the fall of 1895. His language is: "I heard Mrs. Lamon say it was soon time for her to have possession of the money or of the place. He said the place was his and the money, too, but he reckoned he would have to leave her have the place some time, but they had better leave well enough alone for the present. He said that things were very quiet now, but they didn't know what might turn up." This is denied by Miller emphatically, but, if the sale was a fraudulent one, it represents the possible and probable status of the property. It would have been an easy matter for Lamon to have handed the money back to Miller to hold upon a secret trust for the benefit of his wife, Miller's own sister, and not at all inconsistent with the fact of actual payment of the money, but clearly inconsistent with an honest purchase of the farm. The same witness says Lamon told him in the spring of 1894 that he had sold the place, and his brother-in-law, Mr. Miller, had the money in government bonds and that he had three lawyers employed, and that they couldn't touch either the

money or the lands, probably meaning that Lamon's creditors· could not. James M. Collis, called by the defendants in response to a question as to what Lamon told him he had received for the place from Dr. Miller, testified he did not mention the· amount but said: "Jim, I had more money in my pocket at once this week than I ever had in my life," and that this remark was made on the day after Lamon's return from the trip· to Maryland at the time of the alleged consummation of the· sale. This and other similar testimony as to what Lamon said he had done and declared his intention to do, prior to the execution of the deed, though not in themselves amounting to· proof of fraud on the part of Miller, illustrates what may have· taken place between these two men, the fact of payment of the· alleged purchase money to the contrary notwithstanding. Indeed, it is not necessary in order to make the transaction fraudulent, that the money should have been returned to Miller. It is enough that, with knowledge of Lamon's fraudulent intent and by way of participation therein, Miller paid him the money and took a conveyance of the land so as to put it out of reach of Lamon's creditors and make it possible for him to prevent them from obtaining satisfaction of their debts out of the· proceeds.

The circumstance of relationship of the parties already adverted to, although not sufficient to raise a presumption of fraud as in the case of a conveyance by a husband to his wife, puts upon the purchaser the necessity of producing evidence of his good faith and so explaining the facts and circumstances connected with the transaction as to make it withstand a closer and more· rigid scrutiny on the part of the court than is exercised when the transaction is between strangers. When relationship of the· parties to the conveyance exists, circumstances, known in the law of fraudulent conveyances, as badges of fraud, have greater weight than in other cases, for the law cannot overlook and disregard, upon an inquiry as to the good faith of the parties, the natural desire of a brother to protect, defend and shield a sister or other close relative when pursued by creditors. *Ballard* v. *Chewning,* 49 W. Va. 508; *Bank* v. *Gould,* 48 W. Va. 99; *Burt* v. *Timmons,* 29 W. Va. 441; *Bartlett* v. *Cleavenger,* 35 W. Va. 718; *Greer* v. *Mitchell,* 42 W. Va. 499; *Hutchin-*

*son* v. *Boltz,* 35 W. Va. 754; *Butler* v. *Thompson,* 45 W. Va. 660.

The difficulty of direct proof of fraud lies in its very nature. A fraudulent transaction is always secret and hidden as far as it is possible for the parties to it to conceal it from those upon whom it is intended to work wrong and injustice. Hence, the necessity of resorting to circumstantial evidence for proof of it. Such evidence, the courts declare, is not only sufficient to establish the fraudulent character of a conveyance, but is often the only kind of evidence it is possible to procure. Thus, in *Lockhard* v. *Beckley,* 10 W. Va. 87, it is held that: "Although fraud in fact must be shown to impeach a conveyance as to subsequent creditors, it is not required that the actual or express fraudulent intent appear by direct and positive proof; circumstantial evidence is not only sufficient, but in most cases is the only evidence that can be adduced. Fraud is to be legally inferred from the facts and circumstances of the case, when those facts and circumstances are of such a character as to lead a reasonable man to the conclusion that the conveyance was made with the intent to hinder, delay or defraud existing or future creditors." To the same effect see *Stauffer* v. *Kennedy,* 47 W. Va. 714; *Richardson* v. *Ralphsnyder,* 40 W. Va. 15; *Sturm* v. *Chalfant,* 38 W. Va. 248; *Reynolds* v. *Gawthrop,* 37 W. Va. 3; *Bartlett* v. *Cleavenger,* 35 W. Va. 719; *Goshorn* v. *Snodgrass,* 17 W. Va. 717; *Hunter* v *Hunter,* 10 W. Va. 321.

Some of the circumstances tending to establish fraud are so frequently found in the investigation of these cases and given so much weight by the courts that they have been designated as badges of fraud One of them is the retention of possession of the property by the grantor after the conveyance. *Livesay* v. *Beard,* 22 W. Va. 585; *Hutchinson* v. *Boltz,* 35 W. Va. 754; *Blackshire* v. *Pettit,* 35 W Va. 547. It is one of the circumstances characterizing the transaction now under consideration. The grantor remained in possession until the time of his death, and his widow, who has since married, still resides upon, and cultivates, the farm. Its effect is to cast upon the parties the burden of clearly showing that it is not in fact inconsistent with the conveyance as it appears to be. This may be done by proving that the grantor remains in possession under a contract for the use of the land and accounts for the rental thereof.

*Livesay* v. *Beard supra;* 14 Am. & Eng. Enc. L. (2d ed.) 497.
An attempt to do so has been made here and it is to be determin-
ed whether the explanation is sufficient. In his answer to the
original bill, the defendant Miller says that, after having pur-
chased the farm, he agreed that Lamon might stay on it until
the following April, paying as rent therefor, as tenant, one-half
of the crops, and that, after his death, he rented the farm to
his sister at three hundred dollars per year, which she has ever
since paid. In his answer to the amended bill, he says he re-
ceived the wheat crop from the land in November, 1894, and
in the month of March, 1895, paid Mrs. Lamon, the widow, one
hundred dollars of the proceeds thereof, being the balance
thereof after deducting the rent due him for the year ending
April 1, 1895 In his testimony, after having had the aver-
ment of his answer substantially quoted to him, with the in-
quiry as to whether it was correct, he said it was, to the very
letter. Being then asked why he took all the wheat crop that
fall, he explained that the first question was not quite broad
enough to cover the contract, and that in fact he was to have
three hundred dollars rent for the place and it was supposed
by him and Lamon that one-half of the crop would be sufficient
to pay it, but that it had proved to be insufficient. In his sec-
ond deposition, he says upon cross-examination, he was to have
three hundred dollars rent in any event, neither more nor less,
no matter what one-half of the crop might yield. Colonel
Schley's testimony in reference to this is as follows: "I would
add here, that as the purchase was made in May, Dr. Miller, said
it was too late for him to look around for a tenant for that
year, and Mr. Lamon said that he would agree to stay on the
farm for that year, and the Doctor and he agreed upon the rent
that was to be paid to the Doctor for the farm. It was crop
rent, but I do not recall the proportion." Mrs. Lamon did not
testify in the case at all. How the circuit court regarded this
explanation, it is impossible to know, but, viewed in the light of
all the circumstances, the rental contract, and the subsequent
conduct of the parties under it, savors somewhat of indirection
and relaxation of the principles governing a business trans-
action as well as the want of good faith toward creditors. The
sale was made in June shortly before harvest time and the
corn crop must have been well under way. Hence, it is a little

remarkable that the tenant should agree to give one-half of the crop. Then, instead of taking half of the crop, the landlord took the whole of the crop of wheat, saying nothing as to any other crop. There may have been method in this and a design against the creditors, for a division of the crop would have left something for them, but as Miller took it all away and paid a small amount of money to the widow instead of leaving the tenant's one-half of the crop, no opportunity was allowed any creditor to realize anything from it. Why did he pay the money to her instead of the administrator? Whatever the understanding may have been at Hagerstown, Miller was careful to make no representation in the neighborhood of the farm in West Virginia as to any tenancy on the part of Lamon. On the contrary, a witness, Collis, testifies that, after Lamon returned from Hagerstown on the occasion of the sale, he went to see him, and was informed that he had sold the farm to Dr. Miller, but was told by Lamon to remain on it, and as long as he (Lamon) was able he would superintend the place. The same witness says Miller came over and told him to do the best he could in farming the place and that Mr. Lamon would superintend for him. Taking Miller's second statement as to the contract, namely, that he was to have a cash rental of three hundred dollars, his subsequent conduct is equally inconsistent in this, that instead of collecting his rent in cash, leaving the crop free from his interference, he did that which amounted to a representation to the public that the crop belonged to him by taking it and selling it and then deducting his rent. This act was not only inconsistent with the contract, but prejudicial to creditors as it concealed from them Lamon's ownership of the crop, the only visible property the two defendants can point to as remaining in the hands of the debtor out of all the property he had owned but a short time before. This act of Miller's was so close in point of time to the conveyance as to give rise to more than a suspicion that he was cognizant of Lamont's purpose in disposing of his land, and is perfectly consistent with Miller's participation in that fraudulent purpose. His close relationship to Mrs. Lamon, then left a widow, with whose situation he must have been familiar, taken in connection with the fact that Lamon had transferred to her all of his personal property and had nothing left to answer the demand of any

creditor, leaves no room to doubt that, at the time he took away the wheat crop, he knew of the fraud perpetrated by Lamon in the sale of his land and yet he did this act in direct furtherance of that purpose and design. If he was holding the proceeds of the land upon a secret trust, for the benefit of his sister, according to the admission on his part, charged in the testimony of Barber, may he not have taken the wheat crop upon the like condition, and made a mere pretense of deducting rent and paying the balance? Does not the circumstance comport with, and tend to establish the truth of, Barber's statement, rather than to show a *bona fide* relationship of landlord and tenant? It was just as easy to call the one hundred dollar check the balance of proceeds after deducting rent as a payment on account of the secret trust fund.

If Miller participated in Lamon's fraudulent design, it is apparent that the wife, his sister, was to profit by it, and that the secret trust, if any, was for the benefit of both husband and wife. If there was a conspiracy against her husband's creditors, she was undoubtedly an active party to it, for she took all the tangible personal property under a flimsy claim of indebtedness to her for money loaned and property brought on the farm by her and mingled with his at the time of their marriage, and Colonel Schley seems to be quite positive she was with her husband at his office on some occasion, when the fraudulent negotiations were in progress, though he is not certain it was on the day of the payment of the purchase money. This being true, the subsequent fraudulent transactions between her and Miller, and her husband and Miller, concerning the wheat crop, and Lamon's relation to the farm, closely connected in point of time with the principal fraud, constitute admissible and potent circumstantial evidence against Miller on the question of his good faith in purchasing the land. "It seems to be the settled doctrine sustained by numerous adjudicated cases, that where the issue involves the fraudulent sale or conveyance of property, evidence of other like conveyances between the same parties at or about the same time is admissible. The ground for the admission of such evidence is that where such transactions of a similar character, executed by the same parties, are closely connected in time, the reasonable inference is that they proceed

from the same motive. When two transactions made with different parties are claimed to be fraudulent, only one of which, however, is being controverted, it must be shown that they are so connected as to evince a common purpose before the uncontroverted transaction can be admitted in evidence for the purpose of establishing the other to be fraudulent. If, however, the conveyances are made on the same day, or both made to relatives of the grantor, or there are any other circumstances connecting them, it is proper to look at the entire transaction, and in so far as one reflects any light upon the motive prompting the other, to get the benefit of such aid in coming to a conclusion." 14 Am. & Eng. Enc. Law (2d ed). 499, 500.

In addition to the farm, Miller took from Lamon, by asignment, at about the time of the execution of the deed, as indicated by the evidence, two notes, one for $1,000.00, executed by John W. Lamon, and on which Miller has since collected $736.-89, and another for $431.08, executed by Robert Gold, and on which he has realized about $500.00. His possession of these notes was disclosed under the prayer of the original bill for discovery, but neither the answer nor the testimony of Miller sufficiently shows that he had given value for them. He deals with them evasively. He fails to disclose their respective amounts as well as the consideration upon which they were assigned to him. He is unable to state whether they were assigned or merely delivered to him. As to whether he loaned money on them as collateral or purchased them, he is equivocal and indefinite, saying, in his answer, he advanced Lamon money, and, in order to do so, took an assignment from him of the two notes. He has no recollection of the amount advanced and kept no memorandum of it, but is positive it was more than $500.00. Later he says Lamon applied to him for a loan of $400.00, offering the John Lamon note as security, which was declined, and then both notes, which were accepted and $375.00 of the amount requested was advanced thereon, and the balance made up from time to time after the date of the conveyance. His witness, Colonel Schley, says Miller purchased the notes, but, at what price he never knew. He saw no money paid for them. Miller falsely asserted in his answer that one of them was barred by the statute of limitations and afterwards endeavored to explain in his deposition that he really

meant to say it was worthless, which also, if stated, would have been false as he realized the entire amount of one of them and $736.89 on the other. Another false statement, made in the answer and reiterated in the deposition, is that the notes were transferred prior to the purchase of the land. The deed bears date, May 22, 1894, and was recorded on the 12th day of June, 1894, and the assignment of the Robert Gold note is dated June 12, 1894. The date of the assignment of the other does not appear, but Miller's testimony imports that both were assigned at the same time. He has treated the notes as having been purchased, for he took no note or memorandum of the loan to Lamon and made no memorandum of the amount on his books, on the notes or elsewhere. After collecting them he rendered no account of the balance due after reimbursing himself. That the transactions were contemporaneous is manifest. By each, Miller obtained part of Lamon's estate to the detriment and injury of his creditors. Fraud in one is evidence of fraud in the other, as above shown. As to the notes, as well as the land, the burden was upon Miller to show payment of a fair and adequate consideration. "If a creditor attacks, as fraudulent, a conveyance or transfer of property made by his debtor, and proves that his debt existed before such conveyance or transfer, the purchaser, in order to maintain his title, must show that he paid a fair and adequate consideration. It is not necessary, however, that the consideration should have passed at the time of the conveyance; the satisfaction of a pre-existing debt or claim is sufficient." 14 Am. & Eng. Enc. Law (2d ed). 503. The decisions of this Court have declared the proposition to be sound law and applied it. *Rogers* v. *Verlander,* 30 W. Va. 619; *Cohn* v. *Ward* 32 W. Va. 34; *Butler* v. *Thompson,* 45 W. Va. 660. Another rule forcefully applicable here is that looseness or incorrectness in stating the consideration of a conveyance is a badge of fraud. 14 Am. & Eng. Law ( 2d ed). 519. Inability of a grantor to produce a memorandum or other record of antecedent debts, which, he claims, constituted the consideration of the conveyance, is a badge of fraud. *Id.* 519. Does not reason more emphatically demand of the assignee or grantee an intelligent and reasonably certain specification of what he claims to have loaned or paid, together with some corroborative circumstance? Is it reasonable to say Miller let La-

mon have $375.00 on the notes without some memorandum of the aggregate amount agreed upon and the amount actually advanced? That is not the rule or custom among business men, and where the law not only calls for proof of payment, but will scrutinize the evidence of it, the circumstance has weight against the *bona fides* of the claim of payment.

The foregoing observations apply with equal potency on the question of payment of $427.50 of the purchase money of the land. Nobody swears to it but Miller. He says he had Stuckey witness the payment of $250.00 of it, but Stuckey died before the testimony was given. Why was not a receipt taken? Why, instead of taking a receipt, was Stuckey called in for the express purpose of witnessing the payment? Business men take receipts for money paid when witnesses are present and there is no necessity of hunting them up and calling them in. The story would be improbable on its face, but for a reason hereafter to be noticed which may have caused the performance of this unusal act. Why was not the $177.50 paid in Schley's presence or deposited in the bank and included in the checks? Miller says he paid it on the day of the delivery of the checks. Why did he hand over the checks in Schley's presence and then retire with Lamon to give him the cash? There is no memorandum, receipt or other writing by which Miller's statement can be verified, and he gives no reason for failing to pay the money at the time he delivered the checks. Moreover, Schley says no money in addition to the checks was to be paid, as the parties admitted in his presence that Lamon owed Miller the difference on account of borrowed money. Where is the evidence of that loan? Did these men handle sums as large as $400.00 and $500.00 between them in the form of loans and payments without passing any receipts or making mamoranda? A charge of fraud in a conveyance requires on the part of the grantee better evidence of payment of the consideration than Miller has produced as to said sum of $427.50, and his failure to respond to the demand casts suspicion upon the entire transaction between the parties.

Another badge of fraud attendant upon this conveyance is the pains taken to have witnesses to transactions as to which none were necessary. For what purpose could Stuckey have been called as a witness to the alleged payment of $250.00 other

than that he might be able to say he saw the money actually put into Lamon's hands, and give it out in the neighborhood as the payment of the last dollar of the purchase money. Then again, for some mysterious reason, Miller and Lamon so planned as to render it necessary for Colonel Schley to go to the bank to indentify Lamon. Did not the bank officials know Miller, its own customer? Colonel Schley says he and Lamon left Miller at his office, when they started to the bank. Why did they consult Schley and transact the business in his presence? The deed had been written by Stuckey, accepted, approved and recorded several days before the checks were delivered at Schley's office, and there was nothing for him to perform but calculate the amount due. Was it necessary for a physician and an intelligent farmer of large business experience to employ an attorney for that purpose? They evidently went to him for no purpose other than to put him in a position that would enable them to make a witness of him. Having made him an innocent witness to their apparently honest transaction, Miller seems to have forgotten several material representations they made to him. "Wherever there appears to be connected with the transaction circumstances indicating excessive effort to give it the appearance of fairness or regularity, which are not usual attendants of such business, the courts will regard such circumstances as badges of fraud." *Hart* v. *Sandy,* 39 W. Va. 644. An attempt on the part of one accused of crime to manufacture evidence in his favor, is an incriminating circumstance. This being true, it ought to weigh heavily against the parties to a conveyance, attacked by creditors as fraudulent.

Other things casting strong suspicion upon the conduct of the parties to this conveyance and pointing directly to a fraudulent purpose in it on the part of Miller, are disclosed by the record, but those already noticed are sufficient to show that the finding of the circuit court cannot be disturbed. Miller and his sister, the wife of the grantor, took practically everything he had, leaving nothing for creditors. When such a transaction occurs between relatives, the fact that the grantor is immediately afterwards insolvent or without visible means to satisfy his debts, is a badge of fraud. *Stauffer* v. *Kennedy,* 47 W. Va. 714, 719; *Reynold's Adm'rs* v. *Gawthrop,* 37 W. Va. 3;

*Burt* v. *Timmons,* 29 W. Va. 441; *Herzog* v. *Weiler,* 24 W. Va. 199; 14 Am. & Eng. Enc. Law (2d ed). 503.

An assignment of error is predicated upon the failure of the court to allow, as sets-off against the debt due the plaintiffs, two notes executed by Robert Lamon, their intestate, in favor of Chas. S. Lamon, one of which is for the sum of $600.00, and dated June 15, 1887, and the other for $300.00, and dated December 8, 1893. On or about June 15, 1894, Chas. S. Lamon assigned the $600.00 note to J. M. Lamon, who says, in his deposition, it was assigned to him for the purpose of collection for which he was to receive $50 00, and that he did collect, out of the estate of Robert Lamon, $69.99 of the amount due on it. He further says he exchanged for the note one previously executed by Chas. S. Lamon to himself for $150.00 and one for $450.00 contemporaneously executed by him to Chas. S. Lamon. While rather intimating that the transaction between him and Chas S. Lamon as to this note was only a pretended transfer, he claims it and appropriated to his own use what he collected on it. From what source the $300.00 note is produced is not indicated by the record. After proof of Robert Lamon's signature, it was offered as evidence. As to the administrator of Chas S. Lamon, the bill was taken for confessed, and no reference is made to these notes in any pleading except the answer of Maria E. Janney, the widow of Chas. S. Lamon, and she fails to ask that they be set off against the debt asserted by the plaintiffs against the estate of her former husband. After denying any liability by reason of the endorsement of the John W. Lamon note and of liability on any other account to the estate of Robert Lamon on the part of the estate of Chas. S. Lamon, she puts in the following averment concerning the notes: "On the contrary respondent avers and says that at the time of the death of the said Chas. S. Lamon, and now, the said Robert Lamon was indebted to him and that the estate of the said Robert Lamon is still indebted to him on account of various transactions amounting at least to the sum of $1,000.00, and some of which said indebtedness is evidenced by two notes of the said Robert Lamon, one for $700.00 and the other for $300.00, the latter dated December 8, 1893;" and, without making further allegation respecting the notes, prays to be dismissed, &c. If either of these notes belongs to the estate of

Chas. S. Lamon, the legal title thereto is held by the adminis-
trator, and not by Mrs. Janney, and he, if anybody, should have
pleaded it as a set-off. It is an affirmative plea, a cross-action.
Code, chapter 126, section 9; *Kennedy v. Davisson*, 46 W. Va.
433; 4 Min. Inst. 787; Hogg's Pl. & Forms, section 259; *Hud-
son v. Kline*, 9 Grat. 382. A distributee of a decedent's estate
cannot sue at law, and he can do so in equity only under pecu-
liar circumstances, such as refusal or neglect of the administra-
tor to sue, and then he must set forth in his bill the facts ne-
cessitating suit in equity by him. *Tabb v. Cabell*, 17 Grat. 160.
Nothing of the kind appears in this answer. However, it is
unnecessary to decide whether Mrs. Janney could have had the
notes set-off against the debt. She does not aver that she is a
distributee and entitled to any or all of the decedent's estate,
nor does she ask that the notes be set off against the debt   An
answer claiming a set-off must contain the substantial requisites
of a complaint. 19 Ency. Pl. & Pr. 753. Moreover, she does not
appeal and Miller did not claim any right to sets-off in the court
below.

There is an error in the decree, however, which has not been
complained of. It refers the cause to a commissioner for a
settlement of the accounts of the administrator of the estate
of Chas. S. Lamon, deceased, and orders a convention of his
creditors. It does not appear that there are any creditors other
than the plaintiffs and, if there be any, the court can give the
plaintiffs all the relief they demand or are entitled to without
bringing them in. The bill charges that the debtor, in his life-
time, fraudulently conveyed away all his property both real
and personal, and each creditor must follow it up and recover
it, acquiring a lien upon it from the time of the bringing of his
suit. The conveyance and transfers are good between the par-
ties and can only be avoided at the suit of creditors. It is not
a suit to enforce a judgment lien in which the law requires a
convention of creditors. "In cases of this character, therefore,
it is not proper to convene the husband's creditors, nor to rent
the land." SNYDER, JUDGE, in *Core v. Cunningham*, 27 W. Va.
206, 210, a suit to set aside a deed for fraud. As it is unnec-
cessary when but a single creditor attacks the sale and there
is no conflicting claim of priority or other cause for a reference,
the cost of a reference ought not to be inflicted upon the gran-

tee, and it is not perceived that there is any ground upon which the plaintiff or the court may call upon other creditors to attack the conveyance. It is optional with them to assail it or let it stand. In such cases, the law favors the active and diligent creditor, giving him preference over all who have not acquired judgments before the commencement of his suit, and, where there are no judgments, the creditor at large owes no duty to any other creditor of his class. Hence, he need not bring them in, nor has he any right to do so. However, this error is such as can be corrected in this Court and will not reverse the decree, It will be modified so as to dispense with the reference and convention of creditors and, as so modified, it will be affirmed and the cause remanded for further proceedings. As the appellant has not complained of this error, and it has not as yet wrought any injury to him and does not enter into the real controversy presented in this appeal, costs will be awarded to the appellees as the parties substantially prevailing. *Core* v. *Cunningham,* 27 W. Va. 206; *Linsey* v. *McGannon,* 9 W. Va. 154.

The cause will be remanded with directions to enter a decree subjecting the land to the payment of the debt due the plaintiffs and for sale thereof in default of payment.

*Affirmed.*